United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 26, 2004**

Charles R. Fulbruge III
Clerk

Revised March 12, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 00-10784

---

THOMAS JOE MILLER-EL,

Petitioner-Appellant,

VERSUS

DOUGLAS DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

---

Appeal from the United States District Court
for the Northern District of Texas

---

ON REMAND FROM THE UNITED STATES SUPREME COURT

Before DAVIS, JONES, and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:

Petitioner brings this federal habeas corpus petition claiming, pursuant to *Batson v. Kentucky*, that the state trial court erred in finding that there was no purposeful discrimination in the selection of his jury. The district court denied Petitioner relief. The district court then denied a certificate of appealability ("COA"). Petitioner previously appealed to this court and we denied a COA. The Supreme Court reversed. We then

granted COA and now address the merits of Petitioner's appeal.

**BACKGROUND**

On November 16, 1985, Thomas Jo Miller-El, his wife, and Kenneth Flowers robbed a Holiday Inn in Dallas, Texas. During the robbery two employees, Doug Walker and Donald Hall, were ordered to lie on the floor, gagged with strips of fabric, and their hands and feet were bound. Miller-El shot Walker twice in the back and shot Hall in the side. Walker died from his wounds.

The state indicted Miller-El for capital murder. He pleaded not guilty, and jury selection took place during five weeks in February and March 1986. When *voir dire* had been concluded, Miller-El moved to strike the jury on the grounds that the prosecution had violated the Equal Protection Clause of the Fourteenth Amendment by excluding blacks through the use of peremptory challenges. Miller-El's trial occurred before the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986). Therefore, *Swain v. Alabama,* 380 U.S. 202 (1965), was then the controlling precedent. As *Swain* required, Miller-El sought to show that the prosecution's conduct was part of a larger pattern of discrimination aimed at excluding blacks from jury service. In a pretrial hearing held on March 12, 1986, Miller-El presented evidence in support of his motion. The trial judge, however, found "no evidence . . . that indicated any systematic exclusion of blacks as a matter of policy by the District Attorney's office;

2

while it may have been done by individual prosecutors in individual cases." The state court then denied Miller-El's motion to strike the jury. Twelve days later, the jury found Miller-El guilty; and the trial court sentenced him to death.

Miller-El appealed to the Texas Court of Criminal Appeals. While the appeal was pending, on April 30, 1986, the Supreme Court issued its opinion in *Batson v. Kentucky* and established a three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. 476 U.S. at 96-98. First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race. *Id.* at 96-97. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. *Id.* at 97-98. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Id.* at 98.

After acknowledging Miller-El had established an inference of purposeful discrimination, the Texas Court of Criminal Appeals remanded the case for new findings in light of *Batson*. *Miller-El v. State*, 748 S.W.2d 459, 461 (Tex. Crim. App. 1988)(en banc). A post-trial hearing was held on May 10, 1988. There, the original trial court admitted all the evidence presented at the *Swain* hearing and further evidence and testimony from the attorneys in the original trial.

On January 13, 1989, the trial court concluded that Miller-El's evidence failed to satisfy step one of *Batson* because it "did not even raise an inference of racial motivation in the use of the state's peremptory challenges" to support a *prima facie* case. Notwithstanding this conclusion, the state court determined that the state would have prevailed on steps two and three because the prosecutors had offered credible, race-neutral explanations for each black venire member excluded. The court further found "no disparate prosecutorial examination of any of the venire [members] in question" and "that the primary reasons for the exercise of the challenges against each of the venire [members] in question [was] their reluctance to assess or reservations concerning the imposition of the death penalty."

The Texas Court of Criminal Appeals denied Miller-El's appeal, and the Supreme Court denied certiorari. *Miller-El v. Texas*, 510 U.S. 831 (1993). Miller-El's state habeas proceedings fared no better, and he was denied relief by the Texas Court of Criminal Appeals.

Miller-El filed a petition for writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254.[1] The federal magistrate judge who considered the merits of the *Batson* claim

---

[1] Although Miller-El raised four issues, the petition has been narrowed down by the Supreme Court to only the jury selection claim premised on *Batson*. *See Miller-El v. Cockrell*, 537 U.S. 322, 329 (2003).

4

recommended, in deference to the state court's acceptance of the prosecutors' race-neutral justifications for striking the potential jurors, that Miller-El be denied relief. The United States district court adopted the recommendation. Pursuant to 28 U.S.C. § 2253, Miller-El sought a COA from the district court, and the application was denied. Miller-El renewed his request to this Court, and we also denied a COA. Miller-El appealed to the Supreme Court and certiorari was granted. 534 U.S. 1122 (2002). In an opinion issued on February 25, 2003, the Supreme Court concluded based on a "threshold examination" of the record, that the federal district court's rejection of Miller-El's *Batson* claim was "debatable" and thus we had erred in not granting COA on Miller-El's *Batson* claim. *Miller-El v. Cockrell*, 537 U.S. 322, 347-48 (2003). The Supreme Court remanded the case to this Court to determine whether Miller-El can "demonstrate that [the] state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." *Id.* at 348. We granted COA for precisely that determination. *Miller-El v. Johnson*, 330 F.3d 690 (5th Cir. 2003)(per curiam).

## DISCUSSION

Claims of racial discrimination in jury selection are evaluated according to the framework established in *Batson v.*

5

*Kentucky*, which requires a three-step analysis that shifts the burden of production between the parties. 476 U.S. at 96-98. First, the defendant must make a *prima facie* showing that the prosecution has exercised peremptory challenges on the basis of race. *Id.* at 96-97. Second, if the requisite showing has been made, the burden shifts to the prosecution to provide a race-neutral explanation for striking the venire member in question. *Id.* at 97-98. Third, the defendant again has the burden, this time of proving purposeful discrimination. *Id.* at 98. Under *Batson*, the ultimate burden of persuading the court that the state's peremptory challenges are attributable to a discriminatory purpose lies with and never shifts from the defendant. *Id.* at 94 n.18 (citing *Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981)); *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

In the present case, there is no dispute that Miller-El presented a *prima facie* claim under *Batson*'s first step. Nor is there any dispute that the prosecution presented facially race-neutral reasons for exercising each peremptory challenge. The only issue is Miller-El's disagreement with the trial court's determination at *Batson*'s third step that Miller-El had failed to show that the prosecution's reasons for exercising the challenged peremptory strikes were not credible and Miller-El had not demonstrated that purposeful discrimination had occurred. The federal district court has already determined on habeas review that

6

Miller-El has failed to show that the state court erred, and therefore is not entitled to habeas relief. Miller-El is now appealing this determination and COA has been granted. Therefore we now address the merits of Miller-El's appeal.

Under the current scheme for habeas review in federal court, which was substantially updated in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(e)(1) requires that we "presum[e]" the state court's findings of fact "to be correct" unless Miller-El can rebut the presumption "by clear and convincing evidence."[2] As the Supreme Court has stated, the state court's finding at step three of Miller-El's *Batson* claim was a finding of fact and therefore subject to § 2254(e)(1)'s presumption of correctness. *Miller-El*, 537 U.S. at 339 (citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991), for the proposition that the determination made at step three of *Batson* is a "'pure issue of fact' accorded significant deference").

We follow the lead of the Supreme Court in utilizing their decisions in *Hernandez v. New York*, 500 U.S. 352 (1991), and

---

[2] The language of § 2254(e)(1) could not be clearer:
In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

7

*Purkett v. Elem*, 514 U.S. 765 (1995), to guide our decision regarding the trial court's finding of no purposeful discrimination at step three in this *Batson* claim. These Supreme Court opinions state that the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness and credibility of the prosecutor's justification for his peremptory strike. *Purkett*, 514 U.S. at 768; *Hernandez*, 500 U.S. at 364-65. Further, these cases, applying a standard of review even less deferential to the trial court's finding than we are required to apply under AEDPA, articulate that deference is necessary because the reviewing court is not as well positioned as the trial court to make credibility determinations, and once the trial court has made a credibility determination concerning the prosecutor's state of mind regarding the peremptory strikes, the step three determination under *Batson* has been decided. *Purkett*, 514 U.S. at 768 (citing 28 U.S.C. § 2254(d)(8) and stating that the standard of review for a federal habeas claim required that the factual findings of the state court be presumed to be correct, and "may be set aside, absent procedural error, only if they are 'not fairly supported by the record'"); *Hernandez*, 500 U.S. at 366-67 (applying, on direct review of a state court's factual findings, a "clearly erroneous" standard).

Miller-El argues that the state court's finding of the absence of purposeful discrimination was incorrect and the corresponding

8

factual determinations were "objectively unreasonable" in light of the following four areas of evidence that he claims were before the court. First, evidence of historical discrimination by the Dallas County District Attorney's office in the selection of juries. Second, the use of the "jury shuffle" tactic by the prosecution. Third, the alleged similarity between non-black venire members who were not struck by the prosecution and six blacks who were. Fourth, evidence of so-called disparate questioning with respect to venire members' views on the death penalty and their ability to impose the minimum punishment.

First, Miller-El argues that he presented evidence of the Dallas County District Attorney's office "unofficial policy" of excluding blacks from jury service. Some of this evidence was first presented in the *Swain* hearing conducted by the trial court. When Miller-El's counsel attempted to reintroduce this historical evidence at the post-trial *Batson* hearing, the prosecution objected, arguing that even if accurate the evidence was irrelevant under *Batson*. The court admitted the evidence but reserved the right to give it no weight.

As the United States magistrate judge found, there was considerable evidence that the Dallas County District Attorney's office had an unofficial policy of excluding blacks from jury service and that this evidence was disturbing. The district court accepted this finding. But both the magistrate and district court

9

noted that the historical evidence, however disturbing, is not determinative of whether there was purposeful discrimination in the selection of Miller-El's jury. We also note that the apparent culture of discrimination that existed in the past in the Dallas County District Attorney's Office and the individual discriminatory practices that may have been practiced during the time of Miller-El's jury selection by some prosecutors are deplorable. The Supreme Court stated that proof "that the culture of the District Attorney's Office in the past was suffused with bias against African-Americans in jury selection" is "relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions" in Miller-El's case. *Miller-El*, 537 U.S. at 347. In this case, however, the relevancy of this evidence is less significant because Miller-El has already met the burden under the first step of *Batson* and now must prove actual pretext in his case. This historical evidence is relevant to the extent that it could undermine the credibility of the prosecutors' race-neutral reasons. Here, however, as explained below the race-neutral reasons are solidly supported by the record and in accordance with the prosecutors' legitimate efforts to get a jury of individuals open to imposing the death penalty. The state court, in the best position to make a factual credibility determination, heard the historical evidence and determined the prosecutors' race-neutral reasons for the peremptory strikes to be genuine. Under our

10

standard of review, we must presume this specific determination is correct and accordingly the general historical evidence does not prove by clear and convincing evidence that the state court's finding of the absence of purposeful discrimination in Miller-El's jury selection was incorrect.

Second, Miller-El argues that the state court erred in not finding purposeful discrimination based on the use of the "jury shuffle" tactic by the prosecution. The record, however, clearly establishes that Miller-El shuffled the jury five times and the prosecutors shuffled the jury only twice. Again, Miller-El's circumstantial evidence of jury shuffles does not overcome the race-neutral reasons for exercising the challenged peremptory strikes articulated by the prosecutors and accepted by the state court who observed the *voir dire* process including the jury shuffles.

Third, Miller-El argues that there were similarities between non-black venire members who were not struck by the prosecution and six blacks who were. Miller-El maintains that the following six black venire members were victims of racially motivated peremptory strikes: Roderick Bozeman, Billy Jean Fields, Joe Warren, Edwin Rand, Carrol Boggess, and Wayman Kennedy.

As to each of the black venire members Miller-El claims were the victims of racially motivated peremptory strikes, it is important to identify the prosecution's stated reasons for

11

exercising a peremptory challenge.  Once we have identified the reasons for the strikes, the credibility of the reasons is self-evident.  Further, we can determine from the record that there were no unchallenged non-black venire members similarly situated, such that their treatment by the prosecution would indicate the reasons for striking the black members were not genuine.[3]

Roderick Bozeman stated that while he believed in the death penalty as a general proposition, he thought it was only appropriate "if there's no possible way to rehabilitate a person." If Bozeman thought there was a chance of rehabilitation, he did not think the death penalty was appropriate.  He said that a "mentally disturbed" person and "a Manson type" were examples of someone who could not be rehabilitated.  He said, however, that repeated criminal acts of violence would not necessarily indicate that a person was beyond rehabilitation.  Bozeman classified himself as the type of person who believed in the death penalty in principle, but who could not actually serve on a capital jury.  He verified his inability to impose the death penalty by stating that even if the evidence compelled "yes" answers to the special issues posed to the jury at the punishment stage, he might refuse to answer the questions honestly in order to avoid imposing the death penalty.

---

[3] With the exception of black venire members Joe Warren and Paul Bailey, the prosecution set forth its race-neutral reasons for exercising the peremptory challenges immediately after exercising the strikes.  At the subsequent *Batson* hearing the court took judicial notice of that prior testimony in the *voir dire* record.  Miller-El has not based his claim on the prosecution striking Bailey.

12

The prosecution exercised a peremptory challenge to remove Bozeman, citing his views on the death penalty and on rehabilitation, his belief that a pattern of violent conduct would not be sufficient to render a defendant deserving of death, and his "obvious hesitation" concerning his ability to override his personal feelings and answer the special issues according to the evidence.

Venire member Billy Jean Fields stated that he believed in the death penalty and could serve on a capital jury. However, after being informed that the possibility of rehabilitation would be a factor he would need to consider in assessing whether to impose the death penalty, Fields proclaimed that his religious belief was that no one was beyond rehabilitation. Fields stated, "I feel like, if a person has the opportunity to really be talked [to] about God and he commits himself, whereas he has committed this offense, then if he turns his life around, that is rehabilitation." He further stated, "when an individual has really been truly reached by someone reading the word of God to him and they are repentant and they do have a real act of contrition, they can be rehabilitated and that's been demonstrated." Additionally, Fields indicated in his questionnaire and in response to questions by the prosecution that his brother had been incarcerated numerous times for drug offenses. The prosecution exercised a peremptory challenge to remove Fields, citing its concern that his deeply held religious belief in the rehabilitative capacity of all persons could impact his willingness to impose a death sentence and the fact that his

13

brother had been convicted of a felony.

Venire member Joe Warren answered questions during *voir dire* in a noncommital manner and indicated ambivalence about the death penalty and his ability to impose it. He stated, "there are some cases where I would agree [with the death penalty], you know, and there are others that I don't." When the prosecution described the crimes defined as capital murder under Texas law and asked whether Warren felt the death penalty could be an appropriate punishment for such crimes, he responded, "Well, there again, I would say it depends on the case and the circumstances involved at the time." When asked whether the death penalty serves a purpose, Warren answered, "Yes and no. Sometimes I think it does and sometimes I think it don't. Sometimes you have mixed feelings about things like that." When asked whether he could make a decision between a life sentence and a death sentence, Warren answered, "I think I could." When questioned about his ability to answer the future dangerousness special issue question, Warren responded, "I suppose there's always a chance, but there again, you never know." Finally, Warren stated, "Well, it[']s just like I said you know. There are cases, I mean, personally, that I feel I wouldn't want to personally be, you know, involved with it if I had a choice." The prosecution exercised a peremptory challenge to remove Warren. Miller-El's counsel did not object to the peremptory strike against Warren contemporaneous to the strike, therefore the prosecution did

14

not give its race-neutral reasons at *voir dire*. At the *Batson* hearing, the prosecutor cited Warren's hesitation about imposing the death penalty and his inconsistent responses during *voir dire* as the reasons for striking him. The prosecutor also noted that Warren was struck relatively early in the jury selection process when the state had ten challenges remaining before exercising one to remove Warren. The prosecutor noted at the *Batson* hearing that an attorney's strategy regarding the use of peremptory challenges necessarily changes as jury selection progresses and peremptory challenges either remain unused or get used more rapidly. In fact, the prosecutor on cross-examination at the *Batson* hearing admitted that he would have struck non-black jurors Sandra Hearn and Fernando Gutierrez, who also gave somewhat ambivalent answers regarding the death penalty, before Warren had they come up earlier in the process.

Venire member Edwin Rand described capital punishment as a "touchy subject" during *voir dire* but did indicate on his questionnaire that he believed in the death penalty. In response to several alternative choices put to him by the prosecution, Rand described himself as a person who may or may not be able to impose the death penalty. He said, "Somewhere along the line, I would probably think to myself, you know, 'Can I do this?' You know, right now I say I can, but tomorrow I might not." The prosecution exercised a peremptory challenge to remove Rand, citing his

15

ambivalence about the death penalty generally and his lack of ability to serve on a capital jury.

Venire member Carrol Boggess indicated on her questionnaire that she had a moral, religious, or personal belief that would prevent her from imposing the death penalty. During *voir dire* she stated, "Well, I believe I could serve on a case like this, but whether I want to or not is a different thing. I wouldn't want to serve and I wouldn't want to have that responsibility to do that, but if it fell upon me, I would certainly take it and pray to the Lord to help me get through it." Later she stated, "I'm not saying that I feel like I could impose the sentence myself – or I'm not going to be imposing the sentence, is that correct?" When directly asked whether she could vote for a death sentence, she stated, "I've never been in that situation. I don't feel like I would want to be in that situation and whether I could do it or not, I'm not real sure." She continued by stating "whether or not I could actually go through with murder - with killing another person or taking another person's life, I just don't know. I'd have trouble with that." Boggess also indicated that she had testified as a defense witness at her nephew's theft trial. The prosecution exercised a peremptory challenge to remove Boggess, citing as reasons for the strike her hesitancy about assessing a death sentence and the fact that she had served as a defense witness in her nephew's trial.

Venire member Wayman Kennedy stated on his questionnaire he believed in the death penalty "only in extreme cases." On *voir dire* he stated that he believed in the death penalty only for mass murders or cases involving mutilation. Kennedy stated he did not think a murder in the course of a robbery would necessitate the death penalty because "why wouldn't a life sentence be enough." Finally, when asked whether he could answer the special issues "yes" if proved beyond a reasonable doubt, even if he personally felt the defendant should not be sentenced to death, Kennedy replied, "I think I could." The prosecution exercised a peremptory challenge to remove Kennedy, citing his hesitancy to assess the death penalty for murder in the course of robbery, the crime Miller-El was accused of, his view that the death penalty was only appropriate in extreme cases, and his hesitancy in stating that he could answer the special issues according to the evidence.

Miller-El claims that three non-black venire members, Sandra Hearn, Marie Mazza, and Ronald Salsini, expressed views about the death penalty as ambivalent as those expressed by Bozeman, Fields, Warren, Rand, Boggess, and Kennedy, but the three non-black venire members were not struck by the prosecution. The record, especially the *voir dire* transcript, does not support this assertion.

Sandra Hearn stated in her jury questionnaire and on *voir dire* that she believed in the death penalty and could assess it in appropriate cases. She did express the belief that someone should

17

not be sentenced to death on a first offense but if the person had committed any prior offense including robbery or some other criminal act of violence the death penalty would be appropriate. The evidence admitted at the punishment phase of Miller-El's trial indicated he had committed two previous armed robberies and one also involved a kidnaping. Hearn also stated she thought the death penalty should be available for more than just murder but also severe torture and extreme child abuse. She indicated that she had respect for law officers, that her father was a retired FBI agent, and that she had daily contact with police officers in her employment. Miller-El's counsel must have believed Hearn was a pro-prosecution venire member because he attempted to have her challenged for cause on numerous grounds, and when the trial judge found Hearn qualified, Miller-El's counsel requested an additional peremptory strike in order to remove her. In fact, on direct appeal Miller-El continued to argue that the trial court erred in denying his challenge for cause of Hearn, so it seems disingenuous to argue now that she was similarly situated to the black jurors who expressed reservations about imposing the death penalty.

Venire member Maria Mazza indicated on her juror questionnaire that she believed in the death penalty. When asked about her feelings on the death penalty at *voir dire*, she stated, "It's not an easy one and I feel that it depends upon the case, the testimony . . . . It's kind of hard determining somebody's life, whether

they live or die, but I feel that is something that is accepted in our courts now and it is something that – a decision that I think I could make one way or the other." Mazza served on Miller-El's jury.

Venire member Ronald Salsini stated he believed in the death penalty and that he could impose the death penalty. He did indicate imposing the death penalty would be difficult; however, he gave a hypothetical crime based on his personal experience as a bank teller that closely paralleled the crime Miller-El was charged with and stated that such a criminal act was deserving of the death penalty. The prosecution did not strike Salsini but Miller-El's counsel did.

Comparing the views expressed by Hearn, Mazza, and Salsini to the views expressed by the challenged black venire members, it is clear that Hearn, Mazza, and Salsini were not similarly situated for several reasons. First, ambivalence about the death penalty was not the sole reason for striking Bozeman, Fields, or Boggess. Second, Warren, Rand, and Kennedy were struck mainly because of ambivalence about the death penalty, but they each also expressed doubts about whether they personally could impose the death penalty even if the evidence indicated the death penalty was appropriate. This was not the case with Hearn, Mazza, and Salsini. Third, Warren refused to give a clear answer as to whether or not he could impose the death penalty if the evidence warranted it. Fourth, Kennedy stated the death penalty should be limited to extreme

19

cases.  Finally, Rand's ambivalence was less pronounced and more in line with the uncertainty expressed by Hearn and Mazza, although Rand still indicated he was uncertain as to whether he could impose the death penalty.  Under our federal habeas standard of review, however, Miller-El has not shown by clear and convincing evidence that the trial court, who observed the *voir dire* process, erred in finding the prosecution's reason for striking Rand or the other black venire members credible.

Next, Miller-El claims non-black unchallenged venire members Hearn and Kevin Duke expressed views on rehabilitation similar to the views expressed by the black challenged venire members. Hearn's views have already been discussed.  Duke expressed support for the death penalty and said he could impose it.  Duke made comments concerning rehabilitation in the context of the availability of parole, not in the context of whether the death penalty was appropriate.  Duke served on Miller-El's jury.

Again, the record does not support Miller-El's assertion. While the prosecution only cited views concerning rehabilitation as grounds for striking Bozeman and Fields, that was not the sole basis for exercising those strikes.  As previously noted, Bozeman's and Fields' views on rehabilitation were much stronger than Hearn's and Duke's.  Hearn and Duke were not similarly situated to any challenged black venire members.

Finally, Miller-El asserts that non-black venire members Noad

Vickery, Cheryl Davis, Chatta Nix, and Joan Weiner were similarly situated to challenged black venire members who had family members with a criminal background. When Vickery was fifteen his sister had been arrested and served time in California. Vickery was a strong state juror and after unsuccessfully attempting to have him struck for cause, Miller-El used one of his preliminary strikes to remove Vickery. Davis' husband had been convicted of theft ten years earlier. Davis was a strong state juror and Miller-El attempted to have her struck for cause but was unsuccessful. Therefore, Miller-El used one of his preliminary strikes to remove her. Nix's brother entered a guilty plea in a high profile white-collar crime case. Nix, who served as an office manager for her brother's construction company, had been named in several civil suits relating to the white-collar crime issues. Nix was a strong prosecution juror and Miller used one of his preliminary strikes to remove her from the panel. Weiner's ten-year-old son had once been arrested for shoplifting. Weiner served on Miller-El's jury.

Again, the record does not support Miller-El's *Batson* claim. The prosecution only cited a family member with criminal history as grounds for striking Boggess and Fields. Furthermore, that was not the sole basis for striking either Boggess or Fields. In summary, Miller-El has failed to identify any unchallenged non-black venire member similarly situated to the six struck black venire members on whom he is basing his *Batson* claim. Therefore, he has failed to

21

demonstrate by clear and convincing evidence that the state court erred in finding the prosecution's reasons for exercising its preliminary challenges credible.

Fourth, Miller-El also argues that the prosecution posed different questions concerning the death penalty and the minimum allowable punishment to the venire members depending on the race of the venire member. The record, however, reveals that the disparate questioning of venire members depended on the member's views on capital punishment and not race. The prosecution used questioning to either ferret out a venire member's views on the death penalty or to establish a basis to disqualify venire members who had unfavorable views but were not subject to disqualification on those grounds.

One hundred and eight venire members survived the initial round of hardship excuses. The court excused three members for cause prior to *voir dire* and the parties agreed to remove thirty-nine others, including five blacks. Thus, a total of sixty-six venire members were subject to full *voir dire*, including fifty-one non-blacks and fifteen blacks.

The prosecution questioned all venire members concerning their views of the death penalty. A majority of the venire members were informed the state was seeking the death penalty and that affirmative answers to three questions submitted to the jury at the punishment phase would result in Miller-El being sentenced to

22

death, and then asked about their views concerning the death penalty. Prosecutors did utilize a "graphic script" to describe an execution in detail to some venire members. Both black and non-black venire members who had expressed reservations never received the script. However, all black venire members given the graphic script had expressed some level of reservations about the death penalty in their juror questionnaires including Boggess, Kennedy, Bailey, Linda Baker, Troy Woods,[4] Janice Mackey, Anna Keaton, and Jeanette Butler.[5] Some of the non-black venire members questioned with the graphic script expressed reservations including Dominick Desinise and Clara Evans. Non-black venire member Vivian Sztybel did not express reservations about the death penalty yet still received the graphic script. Sztybel was ultimately seated on Miller-El's jury.

Miller-El contends that there were ten black venire members who expressed reservations and seven of these venire members, who were ultimately peremptory challenged by the prosecution, got the script, while there were ten non-black venire members who expressed

---

[4] Woods' questionnaire did not clearly indicate his views on the death penalty and thus he received the graphic script, but on *voir dire* he indicated that he fully supported the death penalty, the state believed him to be an excellent juror and he was in fact seated on Miller-El's jury.

[5] Jeanette Butler's juror questionnaire is not contained in the record, however, at *voir dire* she stated that she was unwilling to impose the death penalty. Butler was ultimately removed for cause.

reservations but only two got the script.  Miller-El argues this disparity proves purposeful discrimination and therefore the trial court erred.  A review of precisely what the prosecution did in terms of *voir dire* questioning indicates the trial court, who observed the *voir dire* process, did not err in finding there was no purposeful discrimination.

The jury questionnaire asked two questions directly relevant to the death penalty.  Question 56 asked, "Do you believe in the death penalty?"  Venire members could circle "yes" or "no," and then they were asked to "[p]lease explain your answer."  Question 58 allowed venire members to circle "yes" or "no" in answering the following question:  "Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would ultimately result in the execution of another human being?"

Presumably, the eight non-blacks who did not receive the graphic script, but Miller-El thinks should have, answered "no" to question 56 and answered to "yes" to question 58.  Questioning on *voir dire* also indicates there was no uncertainty as to the views of these eight non-black venire members.  They were so opposed to the death penalty there was no need to give them a detailed description in order to find out their thoughts; in fact, a detailed description may have simply antagonized them and turned them off to the prosecutors.  In fact, of these eight, five were removed for cause because of their views on the death penalty,

24

including John Nelson, Linda Berk, Gene Hinson, Sheila White, and Joyce Willard while one, Leta Girard, was removed by agreement of the parties. The two others also had strong views, making use of the graphic script unnecessary. Margaret Gibson did not believe in the death penalty and the state exercised a peremptory challenge to remove her. James Holtz believed the death penalty was appropriate only if a police officer or fireman was murdered and the state exercised a peremptory challenge to remove him.

The prosecution treated the black venire members no differently. The blacks who did not receive the graphic formulation (whose questionnaires are contained in the record) all answered "yes" to question 56, stating they believed in the death penalty, and "no" to question 58, indicating that their beliefs would not prevent them from imposing a death sentence. This included Bozeman, Fields, Warren, and Rand. The black venire members who were given the graphic formulation, by contrast, gave ambiguous answers on their juror questionnaires expressing a combination of uncertainty and philosophical opposition to the death penalty. Those venire members included Boggess, Kennedy, Baker, Woods, Mackey, Bailey, and Keaton.

In summary, sixteen venire members for whom questionnaire information is available, clearly indicated on the questionnaires their feelings on the death penalty, and fifteen of them did not receive the graphic script. The one who did receive the script was non-black venire member Sztybel. Eight venire members gave unclear

25

answers and those eight venire members received the graphic script. The answers given, not race, accurately indicated whether a venire member got the graphic script, and this is confirmation of the prosecution's race-neutral rationale.

The prosecution also did not question venire members differently concerning their willingness to impose the minimum punishment for the lesser-included offense of murder. Different questioning on the minimum sentence issue was used as an effort to get venire members the prosecution felt to be ambivalent about the death penalty dismissed for cause. In making the decision whether to employ what Miller-El argues is a "manipulative" minimum punishment script, prosecutors could rely on both the questionnaires and substantial *voir dire* testimony, as the minimum punishment questioning occurred much later in *voir dire* than the graphic death penalty questioning.

Seven black venire members were given the allegedly "manipulative" minimum punishment script, all of whom were opposed to the death penalty in varying degrees. These individuals included Rand, Kennedy, Bozeman, Warren, Baker, Boggess, and Fields.

According to Miller-El's argument the prosecution should have used the "manipulative" punishment script on Woods. But Woods gave answers indicating he would be an excellent state's juror and therefore the prosecution had no reason to attempt to have him

removed. Had the prosecution sought to eliminate blacks because of race, the use of the "manipulative" script would have been deployed against Woods. But it was not, because the prosecution wanted Woods on the jury.

Likewise, there are no similarly situated non-black venire members who, under the prosecution's rationale, would have been questioned about minimum sentencing. This is true because unless a venire member indicated he would be a poor state's juror and would not otherwise be struck for cause or by agreement, there was no reason to use the "manipulative" script. Thus, of the ten non-black venire members who expressed opposition to the death penalty, eight were struck for cause or by agreement, meaning no "manipulative" script was necessary to get them removed. Those struck included Desinise, Evans, Nelson, Berk, Hinson, White, Willard, and Girard. The other two non-black venire members Gibson and Holtz were both given the "manipulative" script and peremptorily struck.

In summary, none of the four areas of evidence Miller-El based his appeal on indicate, either collectively or separately, by clear and convincing evidence that the state court erred. Therefore, the district court correctly denied Miller-El habeas relief.

<u>CONCLUSION</u>

Having carefully reviewed the record in this case, the parties' respective briefing and arguments, and for the reasons set

27

forth above, we affirm the decision of the district court in its denial of habeas relief to Miller-El because he has failed to show by clear and convincing evidence that the state court erred in finding no purposeful discrimination.

**AFFIRMED.**