Justice Souter
delivered the opinion of the Court.
Two years ago, we ordered that a certificate of appealability, under 28 U. S. C. § 2253(c), be issued to habeas petitioner Miller-El, affording review of the District Court’s rejection of the claim that prosecutors in his capital murder trial made peremptory strikes of potential jurors based on race. Today we find Miller-El entitled to prevail on that claim and order relief under § 2254.
I
In the course of robbing a Holiday Inn in Dallas, Texas, in late 1985, Miller-El and his accomplices bound and gagged *236 two hotel employees, whom Miller-El then shot, killing one and severely injuring the other. During jury selection in Miller-El’s trial for capital murder, prosecutors used peremptory strikes against 10 qualified black venire members. Miller-El objected that the strikes were based on race and could not be presumed legitimate, given a history of excluding black members from criminal juries by the Dallas County District Attorney’s Office. The trial court received evidence of the practice alleged but found no “systematic exclusion of blacks as a matter of policy” by that office, App. 882-883, and therefore no entitlement to relief under Swain v. Alabama, 380 U. S. 202 (1965), the case then defining and marking the limits of relief from racially biased jury selection. The court denied Miller-El’s request to pick a new jury, and the trial ended with his death sentence for capital murder.
While an appeal was pending, this Court decided Batson v. Kentucky, 476 U. S. 79 (1986), which replaced Swain’s threshold requirement to prove systemic discrimination under a Fourteenth Amendment jury claim, with the rule that discrimination by the prosecutor in selecting the defendant’s jury sufficed to establish the constitutional violation. The Texas Court of Criminal Appeals then remanded the matter to the trial court to determine whether Miller-El could show that prosecutors in his case peremptorily struck prospective black jurors because of race. Miller-El v. State, 748 S. W. 2d 459 (1988) (en banc).
The trial court found no such demonstration. After reviewing the voir dire record of the explanations given for some of the challenged strikes, and after hearing one of the prosecutors, Paul Macaluso, give his justification for those previously unexplained, the trial court accepted the stated race-neutral reasons for the strikes, which the judge called “completely credible [and] sufficient” as the grounds for a finding of “no purposeful discrimination.” Findings of Fact and Conclusions of Law Upon Remand from the Court of Criminal Appeals in State v. Miller-El, No. 8668-NL (5th Crim. Dist. Ct., Dallas County, Tex., Jan. 13, 1989), pp. 5-6, *237 App. 928-929. The Court of Criminal Appeals affirmed, stating it found “ample support” in the voir dire record for the race-neutral explanations offered by prosecutors for the peremptory strikes. Miller-El v. State, No. 69,677 (Sept. 16, 1992) (per curiam), p. 2, App. 931.
Miller-El then sought habeas relief under 28 U. S. C. §2254, again pressing his Batson claim, among others not now before us. The District Court denied relief, Miller-El v. Johnson, Civil No. 3:96-CV-1992-H (ND Tex., June 5, 2000), App. 987, and the Court of Appeals for the Fifth Circuit precluded appeal by denying a certificate of appealability, Miller-El v. Johnson, 261 F. 3d 445 (2001). We granted certiorari to consider whether Miller-El was entitled to review on the Batson claim, Miller-El v. Cockrell, 534 U. S. 1122 (2002), and reversed the Court of Appeals. After examining the record of Miller-El’s extensive evidence of purposeful discrimination by the Dallas County District Attorney’s Office before and during his trial, we found an appeal was in order, since the merits of the Batson claim were, at the least, debatable by jurists of reason. Miller-El v. Cockrell, 537 U. S. 322 (2003). After granting a certificate of appealability, the Fifth Circuit rejected Miller-El’s Batson claim on the merits. 361 F. 3d 849 (2004). We again granted certiorari, 542 U. S. 936 (2004), and again we reverse.
a

<

It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy.” Strauder v. West Virginia, 100 U. S. 303, 309 (1880); see also Batson v. Kentucky, supra, at 86. Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, Strauder v. West Virginia, supra, at 308, but racial minorities are harmed more generally, for prosecu *238 tors drawing racial lines in picking juries establish “state-sponsored group stereotypes rooted in, and reflective of, historical prejudice,” J. E. B. v. Alabama ex rel. T. B., 511 U. S. 127, 128 (1994).
Nor is the harm confined to minorities. When the government’s choice of jurors is tainted with racial bias, that “overt wrong ... casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial . . . .” Powers v. Ohio, 499 U. S. 400, 412 (1991). That is, the very integrity of the courts is jeopardized when a prosecutor’s discrimination “invites cynicism respecting the jury’s neutrality,” ibid., and undermines public confidence in adjudication, Georgia v. McCollum, 505 U. S. 42, 49 (1992); Edmonson v. Leesville Concrete Co., 500 U. S. 614, 628 (1991); Batson v. Kentucky, supra, at 87. So, “[f]or more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause.” Georgia v. McCollum, supra, at 44; see Strauder v. West Virginia, supra, at 308, 310; Norris v. Alabama, 294 U. S. 587, 596 (1935); Swain v. Alabama, supra, at 223-224; Batson v. Kentucky, supra, at 84; Powers v. Ohio, supra, at 404.
The rub has been the practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences, whatever the race of the individuals on the panel from which jurors are selected. In Swain v. Alabama, we tackled the problem of “the quantum of proof necessary” to show purposeful discrimination, 380 U. S., at 205, with an eye to preserving each side’s historical prerogative to make a peremptory strike or challenge, the very‘nature of which is traditionally “without a reason stated,” id., at 220. The Swain Court tried to relate peremptory challenge to equal protection by presuming the legitimacy of prosecutors’ strikes except in the face of a longstanding pattern of discrimination: when “in case after case, whatever the circumstances,” no blacks served on ju- *239 ríes, then “giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge [were] being perverted.” Id., at 223-224.
Swain’s demand to make out a continuity of discrimination over time, however, turned out to be difficult to the point of unworkable, and in Batson v. Kentucky, we recognized that this requirement to show an extended pattern imposed a “crippling burden of proof” that left prosecutors’ use of pe-remptories “largely immune from constitutional scrutiny.” 476 U. S., at 92-93. By Batson’s day, the law implementing equal protection elsewhere had evolved into less discouraging standards for assessing a claim of purposeful discrimination, id., at 93-95 (citing, e. g., Washington v. Davis, 426 U. S. 229 (1976), and Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252 (1977)), and we accordingly held that a defendant could make out a prima facie case of discriminatory jury selection by “the totality of the relevant facts” about a prosecutor’s conduct during the defendant’s own trial. Batson v. Kentucky, 476 U. S., at 94, 96. “Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging ... jurors” within an arguably targeted class. Id., at 97. Although there may be “any number of bases on which a prosecutor reasonably [might] believe that it is desirable to strike a juror who is not excusable for cause . .., the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e].” Id., at 98, n. 20 (internal quotation marks omitted). “The trial court then will have the duty to determine if the defendant has established purposeful discrimination.” Id., at 98.
Although the move from Swain to Batson left a defendant free to challenge the prosecution without having to cast Swain’s wide net, the net was not entirely consigned to history, for Batson’s individualized focus came with a weakness *240 of its own owing to its very emphasis on the particular reasons a prosecutor might give. If any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence Batson’s explanation that a defendant may rely on “all relevant circumstances” to raise an inference of purposeful discrimination. 476 U. S., at 96-97.
B
This case comes to us on review of a denial of habeas relief sought under 28 U. S. C. §2254, following the Texas trial court’s prior determination of fact that the State’s race-neutral explanations were true, see Purkett v. Elem, 514 U. S. 765, 769 (1995) (per curiam); Batson v. Kentucky, supra, at 98, n. 21.
Under the Antiterrorism and Effective Death Penalty Act of 1996, Miller-El may obtain relief only by showing the Texas conclusion to be “an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U. S. C. § 2254(d)(2). Thus we presume the Texas court’s factual findings to be sound unless Miller-El rebuts the “presumption of correctness by clear and convincing evidence.” § 2254(e)(1). The standard is demanding but not insatiable; as we said the last time this case was here, “[d]eference does not by definition preclude relief.” Miller-El v. Cockrell, 537 U. S., at 340.
r-H J-H H-\
A
The numbers describing the prosecution’s use of perempto-ries are remarkable. Out of 20 black members of the 108-person venire panel for Miller-El’s trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were *241 peremptorily struck by the prosecution. Id., at 331. “The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members .... Happenstance is unlikely to produce this disparity.” Id., at 342.
More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson’s third step. Cf. Reeves v. Sanderson Plumbing Products, Inc., 530 U. S. 133, 147 (2000) (in employment discrimination cases, “[p]roof that the defendant’s explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive”). While we did not develop a comparative juror analysis last time, we did note that the prosecution’s reasons for exercising peremptory strikes against some black panel members appeared equally on point as to some white jurors who served. Miller-El v. Cockrell, supra, at 343.[1] The details of two panel member comparisons bear this out.[2]
*242 The prosecution used its second peremptory strike to exclude Billy Jean Fields, a black man who expressed unwavering support for the death penalty. On the questionnaire filled out by all panel members before individual examination on the stand, Fields said that he believed in capital punishment, Joint Lodging 14, and during questioning he disclosed his belief that the State acts on God's behalf when it imposes the death penalty. “Therefore, if the State exacts death, then that’s what it should be.” App. 174. He testified that he had no religious or philosophical reservations about the death penalty and that the death penalty deterred crime. Id., at 174-175. He twice averred, without apparent hesitation, that he could sit on Miller-El’s jury and make a decision to impose this penalty. Id., at 176-177.
Although at one point in the questioning, Fields indicated that the possibility of rehabilitation might be relevant to the likelihood that a defendant would commit future acts of violence, id., at 183, he responded to ensuing questions by saying that although he believed anyone could be rehabilitated, this belief would not stand in the way of a decision to impose the death penalty:
“[B]ased on what you [the prosecutor] said as far as the crime goes, there are only two things that could be rendered, death or life in prison. If for some reason the testimony didn’t warrant death, then life imprisonment *243 would give an individual an opportunity to rehabilitate. But, you know, you said that the jurors didn’t have the opportunity to make a personal decision in the matter with reference to what I thought or felt, but it was just based on the questions according to the way the law has been handed down.” Id., at 185 (alteration omitted).
Fields also noted on his questionnaire that his brother had a criminal history. Joint Lodging 13. During questioning, the prosecution went into this, too:
“Q Could you tell me a little bit about that?
“A He was arrested and convicted on [a] number of occasions for possession of a controlled substance.
“Q Was that here in Dallas?
“A Yes.
“Q Was he involved in any trials or anything like that? “A I suppose of sorts. I don’t really know too much about it.
“Q Was he ever convicted?
"A Yeah, he served time.
“Q Do you feel that that would in any way interfere with your service on this jury at all?
“A No.” App. 190 (alteration omitted).
Fields was struck peremptorily by the prosecution, with prosecutor James Nelson offering a race-neutral reason:
“[W]e . . . have concern with reference to some of his statements as to the death penalty in that he said that he could only give death if he thought a person could not be rehabilitated and he later made the comment that any person could be rehabilitated if they find God or are introduced to God and the fact that we have a concern that his religious feelings may affect his jury service in this case.” Id., at 197 (alteration omitted).
*244 Thus, Nelson simply mischaracterized Fields’s testimony. He represented that Fields said he would not vote for death if rehabilitation was possible, whereas Fields unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation. Perhaps Nelson misunderstood, but unless he had an ulterior reason for keeping Fields off the jury we think he would have proceeded differently. In light of Fields’s outspoken support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.
If, indeed, Fields’s thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no evident reservations. Sandra Hearn said that she believed in the death penalty “if a criminal cannot be rehabilitated and continues to commit the same type of crime.” Id., at 429.[3] Hearn went so far as to express doubt that at the penalty phase of a capital case she could conclude that a convicted murderer “would probably commit some criminal acts of violence in the future.” Id., at 440. “People change,” she said, making it hard to assess the risk of someone’s future dangerousness. “[T]he evidence would have to be awful strong.” Ibid. But the prosecution did not respond to Hearn the way it did to Fields, and without delving into her views about rehabilitation with any further question, it raised no objection to her serving on the jury. White panelist Mary Witt said she would take the possibility of rehabilitation into account in deciding at the penalty phase of the trial about a defendant’s probability of future dangerousness, 6 Record of Voir Dire 2433 (hereinafter Record), but the prosecutors asked her no further question about her views on reformation, and they *245 accepted her as a juror, id., at 2464-2465.[4] Latino venireman Fernando Gutierrez, who served on the jury, said that he would consider the death penalty for someone who could not be rehabilitated, App. 777, but the prosecutors did not question him further about this view. In sum, nonblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a black juror’s belief in the possibility of reformation even though he repeatedly stated his approval of the death penalty and testified that he could impose it according to state legal standards even when the alternative sentence of life imprisonment would give a defendant (like everyone else in the world) the opportunity to reform.[5]
The unlikelihood that his position on rehabilitation had anything to do with the peremptory strike of Fields is underscored by the prosecution’s response after Miller-El’s lawyer pointed out that the prosecutor had misrepresented Fields’s responses on the subject. A moment earlier the prosecutor *246 had finished his misdescription of Fields’s views on potential rehabilitation with the words, “Those are our reasons for exercising our . . . strike at this time.” Id., at 197. When defense counsel called him on his misstatement, he neither defended what he said nor withdrew the strike. Id., at 198. Instead, he suddenly came up with Fields’s brother’s prior conviction as another reason for the strike. Id., at 199.
It would be difficult to credit the State’s new explanation, which reeks of afterthought. While the Court of Appeals tried to bolster it with the observation that no seated juror was in Fields’s position with respect to his brother, 361 F. 3d, at 859-860, the court’s readiness to accept the State’s substitute reason ignores not only its pretextual timing but the other reasons rendering it implausible. Fields’s testimony indicated he was not close to his brother, App. 190 (“I don’t really know too much about it”), and the prosecution asked nothing further about the influence his brother’s history might have had on Fields, as it probably would have done if the family history had actually mattered. See, e.g., Ex parte Travis, 776 So. 2d 874, 881 (Ala. 2000) (“[T]he State’s failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination”). There is no good reason to doubt that the State’s afterthought about Fields’s brother was anything but makeweight.
The Court of Appeals’s judgment on the Fields strike is unsupportable for the same reason the State’s first explanation is itself unsupportable. The Appeals Court’s description of Fields’s voir dire testimony mentioned only his statements that everyone could be rehabilitated, failing to note that Fields affirmed that he could give the death penalty if the law and evidence called for it, regardless of the possibility of divine grace. The Court of Appeals made no mention of the fact that the prosecution mischaracterized Fields as *247 saying he could not give death if rehabilitation were possible. 361 F. 3d, at 856.
In sum, when we look for nonblack jurors similarly situated to Fields, we find strong similarities as well as some differences.[6] But the differences seem far from significant, particularly when we read Fields’s voir dire testimony in its entirety. Upon that reading, Fields should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutors’ explanations for the strike cannot reasonably be accepted. See Miller-El v. Cockrell, 537 U. S., at 339 (the credibility of reasons given can be measured by “how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy”).
The prosecution’s proffered reasons for striking Joe Warren, another black venireman, are comparably unlikely. Warren gave this answer when he was asked what the death penalty accomplished:
“I don’t know. It’s really hard to say because I know sometimes you feel that it might help to deter crime and then you feel that the person is not really suffering. You’re taking the suffering away from him. So it’s like I said, sometimes you have mixed feelings about whether or not this is punishment or, you know, you’re *248 relieving personal punishment.” App. 205; 3 Record 1532.
The prosecution said nothing about these remarks when it struck Warren from the panel, but prosecutor Paul Macaluso referred to this answer as the first of his reasons when he testified at the later Batson hearing:
“I thought [Warren’s statements on voir dire] were inconsistent responses. At one point he says, you know, on a case-by-case basis and at another point he said, well, I think — I got the impression, at least, that he suggested that the death penalty was an easy way out, that they should be made to suffer more.” App. 909.
On the face of it, the explanation is reasonable from the State’s point of view, but its plausibility is severely undercut by the prosecution’s failure to object to other panel members who expressed views much like Warren’s. Kevin Duke, who served on the jury, said, “sometimes death would be better to me than — being in prison would be like dying every day and, if you were in prison for life with no hope of parole, I[’d] just as soon have it over with than be in prison for the rest of your life.” Id., at 372. Troy Woods, the one black panelist to serve as juror, said that capital punishment “is too easy. I think that’s a quick relief.... I feel like [hard labor is] more of a punishment than putting them to sleep.” Id., at 408. Sandra Jenkins, whom the State accepted (but who was then struck by the defense) testified that she thought “a harsher treatment is life imprisonment with no parole.” Id., at 542. Leta Girard, accepted by the State (but also struck by the defense) gave her opinion that “living sometimes is a worse — is worse to me than dying would be.” Id., at 624. The fact that Macaluso’s reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext.
*249 The suggestion of pretext is not, moreover, mitigated much by Macaluso’s explanation that Warren was struck when the State had 10 peremptory challenges left and could afford to be liberal in using them. Id., at 908. If that were the explanation for striking Warren and later accepting panel members who thought death would be too easy, the prosecutors should have struck Sandra Jenkins, whom they examined and accepted before Warren. Indeed, the disparate treatment is the more remarkable for the fact that the prosecutors repeatedly questioned Warren on his capacity and willingness to impose a sentence of death and elicited statements of his ability to do so if the evidence supported that result and the answer to each special question was yes, id., at 202.2, 202.3, 205, 207, whereas the record before us discloses no attempt to determine whether Jenkins would be able to vote for death in spite of her view that it was easy on the convict, id., at 541-546. Yet the prosecutors accepted the white panel member Jenkins and struck the black venireman Warren.
Macaluso’s explanation that the prosecutors grew more sparing with peremptory challenges as the jury selection wore on does, however, weaken any suggestion that the State’s acceptance of Woods, the one black juror, shows that race was not in play. Woods was the eighth juror, qualified in the fifth week of jury selection. Joint Lodging 125. When the State accepted him, 11 of its 15 peremptory strikes were gone, 7 of them used to strike black panel members. Id., at 137. The juror questionnaires show that at least three members of the venire panel yet to be questioned on the stand were opposed to capital punishment, Janice Mackey, id., at 79; Paul Bailey, id., at 63; and Anna Keaton, id., at 55.[7] With at least three remaining panel members *250 highly undesirable to the State, the prosecutors had to exercise prudent restraint in using strikes. This late-stage decision to accept a black panel member willing to impose a death sentence does not, therefore, neutralize the early-stage decision to challenge a comparable venireman, Warren. In fact, if the prosecutors were going to accept any black juror to obscure the otherwise consistent pattern of opposition to seating one, the time to do so was getting late.[8]
The Court of Appeals pretermitted these difficulties by stating that the prosecution’s reason for striking Warren was a more general ambivalence about the penalty and his ability to impose it, 361 F. 3d, at 856-857 (and the dissent presses that explanation here, post, at 286-289). But this rationalization was erroneous as a matter of fact and as a matter of law.
As to fact, Macaluso said nothing about any general ambivalence. He simply alluded to the possibility that Warren might think the death penalty too easy on some defendants, saying nothing about Warren’s ability to impose the penalty when it appeared to be warranted.[9] On the contrary, though *251 Warren had indeed questioned the extent to which the death penalty served a purpose in society, App. 205, he explained his position in response to the very next question: it was not any qualm about imposing what society generally deems its harshest punishment, but his concern that the death penalty might not be severe enough, ibid. When Warren was asked whether he could impose the death penalty he said he thought he could; when told that answering yes to the special issue questions would be tantamount to voting for death he said he could give yes answers if the evidence supported them. Id., at 207.[10]
As for law, the rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and *252 it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. 476 U. S., at 96-97; Miller-El v. Cockrell, 537 U. S., at 339. It is true that peremptories are often the subjects of instinct, Batson v. Kentucky, supra, at 106 (Marshall, J., concurring), and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals’s and the dissent’s substitution of a reason for eliminating Warren does nothing to satisfy the prosecutors’ burden of stating a racially neutral explanation for their own actions.
The whole of the voir dire testimony subject to consideration casts the prosecution’s reasons for striking Warren in an implausible light. Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not.[11]
*253 B
The case for discrimination goes beyond these comparisons to include broader patterns of practice during the jury selection. The prosecution’s shuffling of the venire panel, its en-quiry into views on the death penalty, its questioning about minimum acceptable sentences: all indicate decisions probably based on race. Finally, the appearance of discrimination is confirmed by widely known evidence of the general policy of the Dallas County District Attorney’s Office to exclude black venire members from juries at the time Miller-El’s jury was selected.
The first clue to the prosecutors’ intentions, distinct from the peremptory challenges themselves, is their resort during voir dire to a procedure known in Texas as the jury shuffle. In the State’s criminal practice, either side may literally reshuffle the cards bearing panel members’ names, thus rearranging the order in which members of a venire panel are seated and reached for questioning.[12] Once the order is established, the panel members seated at the back are likely to escape voir dire altogether, for those not questioned by the end of the week are dismissed. As we previously explained,
*254 “the prosecution’s decision to seek a jury shuffle when a predominant number of African-Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense’s shuffle until after the new racial composition was revealed, raise a suspicion that the State sought to exclude African-Americans from the jury. Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney’s Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past.” Miller-El v. Cockrell, supra, at 346.
In this case, the prosecution and then the defense shuffled the cards at the beginning of the first week of voir dire; the record does not reflect the changes in order. App. 113-114. At the beginning of the second week, when a number of black members were seated at the front of the panel, the prosecution shuffled.[13] 2 Record 836-837. At the beginning of the third week, the first four panel members were black. The prosecution shuffled, and these black panel members ended up at the back. Then the defense shuffled, and the black panel members again appeared at the front. The prosecution requested another shuffle, but the trial court refused. App. 124-132. Finally, the defense shuffled at the beginning of the fourth and fifth weeks of voir dire; the record does not reflect the panel’s racial composition before or after those shuffles. Id., at 621-622; 9 Record 3585-3586.
The State notes in its brief that there might be racially neutral reasons for shuffling the jury, Brief for Respondent 36-37, and we suppose there might be. But no racially neutral reason has ever been offered in this case, and nothing *255 stops the suspicion of discriminatory intent from rising to an inference.[14]
The next body of evidence that the State was trying to avoid black jurors is the contrasting voir dire questions posed respectively to black and nonblack panel members, on two different subjects. First, there were the prosecutors’ statements preceding questions about a potential juror’s thoughts on capital punishment. Some of these prefatory statements were cast in general terms, but some followed the so-called graphic script, describing the method of execution in rhetorical and clinical detail. It is intended, Miller-El contends, to prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause. If the graphic script is given to a higher proportion of blacks than whites, this is evidence that prosecutors more often wanted blacks off the jury, absent some neutral and extenuating explanation.
As we pointed out last time, for 94% of white venire panel members, prosecutors gave a bland description of the death penalty before asking about the individual’s feelings on the subject. Miller-El v. Cockrell, 537 U. S., at 332. The abstract account went something like this:
“I feel like it [is] only fair that we tell you our position in this case. The State of Texas ... is actively seeking the death penalty in this case for Thomas Joe Miller-El. We anticipate that we will be able to present to a jury the quantity and type of evidence necessary to convict him of capital murder and the quantity and type of evi *256 dence sufficient to allow a jury to answer these three questions over here in the affirmative. A yes answer to each of those questions results in an automatic death penalty from Judge McDowell.” App. 564-565.
Only 6% of white venire panelists, but 53% of those who were black, heard a different description of the death penalty before being asked their feelings about it. This is an example of the graphic script:
“I feel like you have a right to know right up front what our position is. Mr. Kinne, Mr. Macaluso and myself, representing the people of Dallas County and the state of Texas, are actively seeking the death penalty for Thomas Joe Miller-El....
“We do that with the anticipation that, when the death penalty is assessed, at some point Mr. Thomas Joe Miller-El — the man sitting right down there — will be taken to Huntsville and will be put on death row and at some point taken to the death house and placed on a gurney and injected with a lethal substance until he is dead as a result of the proceedings that we have in this court on this case. So that’s basically our position going into this thing.” Id., at 572-573 (alteration omitted).
The State concedes that this disparate questioning did occur but argues that use of the graphic script turned not on a panelist’s race but on expressed ambivalence about the death penalty in the preliminary questionnaire.[15] Prosecu *257 tors were trying, the argument goes, to weed out noncommittal or uncertain jurors, not black jurors. And while some white venire members expressed opposition to the death penalty on their questionnaires, they were not read the graphic script because their feelings were already clear. The State says that giving the graphic script to these panel members would only have antagonized them. Brief for Respondent 27-32.
This argument, however, first advanced in dissent when the case was last here, Miller-El v. Cockrell, supra, at 364-368 (opinion of Thomas, J.), and later adopted by the State and the Court of Appeals, simply does not fit the facts. Looking at the answers on the questionnaires, and at voir dire testimony expressly discussing answers on the question *258 naires,[16] we find that black venire members were more likely than nonblacks to receive the graphic script regardless of their expressions of certainty or ambivalence about the death penalty, and the State’s chosen explanation for the graphic script fails in the cases of four out of the eight black panel members who received it.[17] Two of them, Janice Mackey and Anna Keaton, clearly stated opposition to the death penalty but they received the graphic script,[18] while the black panel members Wayman Kennedy and Jeannette Butler were unambiguously in favor[19] but got the graphic *259 description anyway.[20] The State’s explanation does even worse in the instances of the five nonblacks who received the graphic script, missing the mark four times out of five: Vivian Sztybel and Filemon Zablan received it,[21] although each was unambiguously in favor of the death penalty,[22] while Dominick Desinise and Clara Evans unambiguously opposed it[23] but were given the graphic version.[24]
The State’s purported rationale fails again if we look only to the treatment of ambivalent panel members, ambivalent black individuals having been more likely to receive the graphic description than ambivalent nonblacks. Three non-black members of the venire indicated ambivalence to the death penalty on their questionnaires;[25] only one of them, *260 Fernando Gutierrez, received the graphic script.[26] But of the four black panel members who expressed ambivalence,[27] all got the graphic treatment.[28]
The State’s attempt at a race-neutral rationalization thus simply fails to explain what the prosecutors did. But if we posit instead that the prosecutors’ first object was to use the graphic script to make a case for excluding black panel members opposed to or ambivalent about the death penalty, there is a much tighter fit of fact and explanation.[29] Of the 10 nonblacks whose questionnaires expressed ambivalence or opposition,[30] only 30% received the graphic treatment.[31] But of the seven blacks who expressed ambivalence or opposition,[32] 86% heard the graphic script.[33] As between the State’s ambivalence explanation and Miller-El’s racial one, race is much the better, and the reasonable inference is that race was the major consideration when the prosecution chose to follow the graphic script.
*261 The same is true for another kind of disparate questioning, which might fairly be called trickery. The prosecutors asked members of the panel how low a sentence they would consider imposing for murder. Most potential jurors were first told that Texas law provided for a minimum term of five years, but some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike. Two Terms ago, we described how this disparate questioning was correlated with race:
“Ninety-four percent of whites were informed of the statutory minimum sentence, compared [with] only twelve and a half percent of African-Americans. No explanation is proffered for the statistical disparity. Pierre v. Louisiana, 306 U. S. 354, 361-362 (1939) ( “The fact that the testimony... was not challenged by evidence appropriately direct, cannot be brushed aside.” Had there been evidence obtainable to contradict and disprove the testimony offered by petitioner, it cannot be assumed that the State would have refrained from introducing it’ (quoting Norris v. Alabama, 294 U. S. 587, 594-595 (1935))). Indeed, while petitioner’s appeal was pending before the Texas Court of Criminal Appeals, that court found a Batson violation where this precise line of disparate questioning on mandatory minimums was employed by one of the same prosecutors who tried the instant case. Chambers v. State, 784 S. W. 2d 29, 31 (Tex. Crim. App. 1989).” Miller-El v. Cockrell, 537 U. S., at 345.
The State concedes that the manipulative minimum punishment questioning was used to create cause to strike, Brief for Respondent 33, and n. 26, but now it offers the extenuation that prosecutors omitted the 5-year information not on the basis of race, but on stated opposition to the death pen *262 alty, or ambivalence about it, on the questionnaires and in the voir dire testimony, id., at 34-35. On the State’s identification of black panel members opposed or ambivalent, all were asked the trick question.[34] But the State’s rationale flatly fails to explain why most white panel members who expressed similar opposition or ambivalence were not subjected to it. It is entirely true, as the State argues, id., at 35, that prosecutors struck a number of nonblack members of the panel (as well as black members) for cause or by agreement before they reached the point in the standard voir dire sequence to question about minimum punishment. But this is no answer; 8 of the 11 nonblack individuals who voiced opposition or ambivalence were asked about the acceptable minimum only after being told what state law required.[35] *263 Hence, only 27% of nonblaeks questioned on the subject who expressed these views were subjected to the trick question, as against 100% of black members. Once again, the implication of race in the prosecutors’ choice of questioning cannot be explained away.[36]
There is a final body of evidence that confirms this conclusion. We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries, as we explained the last time the case was here.
*264 “Although most of the witnesses [presented at the Swain hearing in 1986] denied the existence of a systematic policy to exclude African-Americans, others disagreed. A Dallas County district judge testified that, when he had served in the District Attorney’s Office from the late-1950’s to early-1960’s, his superior warned him that he would be fired if he permitted any African-Americans to serve on a jury. Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978 testified that he believed the office had a systematic policy of excluding African-Americans from juries.
“Of more importance, the defense presented evidence that the District Attorney’s Office had adopted a formal policy to exclude minorities from jury service. ... A manual entitled ‘Jury Selection in a Criminal Case’ [sometimes known as the Sparling Manual] was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney’s Office, outlining the reasoning for excluding minorities from jury service. Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller-El’s trial.” Miller-El v. Cockrell, 537 U. S., at 334-335.[37]
Prosecutors here “marked the race of each prospective juror on their juror cards.” Id., at S47.[38]
*265 The Court of Appeals concluded that Miller-El failed to show by clear and convincing evidence that the state court’s finding of no discrimination was wrong, whether his evidence was viewed collectively or separately. 361 F. 3d, at 862. We find this conclusion as unsupportable as the “dismissive and strained interpretation” of his evidence that we disapproved when we decided Miller-El was entitled to a certificate of appealability. See Miller-El v. Cockrell, supra, at 344. It is true, of course, that at some points the significance of Miller-El’s evidence is open to judgment calls, but when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination.
In the course of drawing a jury to try a black defendant, 10 of the 11 qualified black venire panel members were peremptorily struck. At least two of them, Fields and Warren, were ostensibly acceptable to prosecutors seeking a death verdict, and Fields was ideal. The prosecutors’ chosen race-neutral reasons for the strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny.
The strikes that drew these incredible explanations occurred in a selection process replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race. At least two of the jury shuffles conducted by the State make no sense except as efforts to delay consideration of black jury panelists to the end of the week, when they might not even be reached. The State has in fact never offered any other explanation. Nor has the State denied that disparate lines of questioning were pursued: 53% of black panelists but only 3% of nonblacks were questioned with a graphic script meant to induce qualms about applying the death penalty (and thus explain a strike), and 100% of blacks but only 27% of nonblacks were subjected to a trick question about the minimum acceptable penalty for murder, *266 meant to induce a disqualifying answer. The State’s attempts to explain the prosecutors’ questioning of particular witnesses on nonracial grounds fit the evidence less well than the racially discriminatory hypothesis.
If anything more is needed for an undeniable explanation of what was going on, history supplies it. The prosecutors took their cues from a 20-year-old manual of tips on jury selection, as shown by their notes of the race of each potential juror. By the time a jury was chosen, the State had peremptorily challenged 12% of qualified nonblack panel members, but eliminated 91% of the black ones.
It blinks reality to deny that the State struck Fields and Warren, included in that 91%, because they were black. The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State’s pretextual positions confirm Miller-El’s claim, and the prosecutors’ own notes proclaim that the Sparling Manual’s emphasis on race was on their minds when they considered every potential juror.
The state court’s conclusion that the prosecutors’ strikes of Fields and Warren were not racially determined is shown up as wrong to a clear and convincing degree; the state court’s conclusion was unreasonable as well as erroneous. The judgment of the Court of Appeals is reversed, and the case is remanded for' entry of judgment for petitioner together with orders of appropriate relief.

It is so ordered.

 While many of these explanations were offered contemporaneously, “the state trial court had no occasion to judge the credibility of these explanations at that time because our equal protection jurisprudence then, dictated by Swain, did not require it.” Miller-El v. Cockrell, 537 U. S., at 343. Other evidence was presented in the Batson v. Kentucky, 476 U. S. 79 (1986), hearing, but this was offered two years after trial and “was subject to the usual risks of imprecision and distortion from the passage of time.” 537 U. S., at 343.

 The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El’s arguments about the prosecution’s disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been “put before the Texas courts.” Post, at 279 (opinion of Thomas, J.). But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence. See 28 U. S. C. § 2254(d)(2) (state-court factfinding *242 must be assessed “in light of the evidence presented in the State court proceeding”); Miller-El v. Cockrell, supra, at 348 (habeas petitioner must show unreasonability “in light of the record before the [state] court”). There can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not “fairly presen[t]” his Batson claim to the state courts. Picard v. Connor, 404 U. S. 270, 275 (1971).
Only as to the juror questionnaires and information cards is there question about what was before the state courts. Unlike the dissent, see post, at 281-282, we reach no decision about whether the limitation on evidence in § 2254(d)(2) is waiveable. See infra, at 256-257, n. 15.

 Hearn could give the death penalty for murder if the defendant had committed a prior offense of robbery, in which case she would judge “according to the situation,” App. 430, and she thought the death penalty might be appropriate for offenses like “[e]xtreme child abuse,” ibid.

 Witt ultimately did not serve because she was peremptorily struck by the defense. 6 Record 2465. The fact that Witt and other venire members discussed here were peremptorily struck by the defense is not relevant to our point. For each of them, the defense did not make a decision to exercise a peremptory until after the prosecution decided whether to accept or reject, so each was accepted by the prosecution before being ultimately struck by the defense. And the underlying question is not what the defense thought about these jurors but whether the State was concerned about views on rehabilitation when the venireperson was not black.
The dissent offers other reasons why these nonblack panel members who expressed views on rehabilitation similar to Fields’s were otherwise more acceptable to the prosecution than he was. See post, at 293-296. In doing so, the dissent focuses on reasons the prosecution itself did not offer. See infra, at 252.

 Prosecutors did exercise peremptory strikes on Penny Crowson and Charlotte Whaley, who expressed views about rehabilitation similar to those of Witt and Gutierrez. App. 554, 715.

 The dissent contends that there are no white panelists similarly situated to Fields and to panel member Joe Warren because ‘““[s]imilarly situated” does not mean matching any one of several reasons the prosecution gave for striking a potential juror — it means matching all of them.”’ Post, at 291 (quoting Miller-El v. Cockrell, 537 U. S., at 362-363 (Thomas, J., dissenting)). None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. Nothing in the combination of Fields’s statements about rehabilitation and his brother’s history discredits our grounds for inferring that these purported reasons were pretextual. A per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters.

 Each of them was black and each was peremptorily struck by the State after Woods’s acceptance. It is unclear whether the prosecutors knew they were black prior to the voir dire questioning on the stand, though *250 there is some indication that they did: prosecutors noted the race of each panelist on all of the juror cards, Miller-El v. Cockrell, 587 U. S., at 347, even for those panelists who were never questioned individually because the week ended before it was their turn.

 Nor is pretextual indication mitigated by Macaluso’s further reason that Warren had a brother-in-law convicted of a crime having to do with food stamps for which he had to make restitution. App. 910. Macaluso never questioned Warren about his errant relative at all; as with Fields’s brother, the failure to ask undermines the persuasiveness of the claimed concern. And Warren’s brother’s criminal history was comparable to those of relatives of other panel members not struck by prosecutors. Cheryl Davis’s husband had been convicted of theft and received seven years’ probation. Id., at 695-696. Chatta Nix’s brother was involved in white-collar fraud. Id., at 613-614. Noad Vickery’s sister served time in a penitentiary several decades ago. Id., at 240-241.

 But even if Macaluso actually had explained that he exercised the strike because Warren was diffident about imposing death, it would have been hard to square that explanation with the prosecution’s tolerance for *251 a number of ambivalent white panel members. Juror Marie Mazza, for example, admitted some concern about what her associates might think of her if she sat on a jury that called for the death penalty. Id., at 354-355. Ronald Salsini, accepted by the prosecution but then struck by the defense, worried that if he gave the death penalty he might have a “problem” in the future with having done so. Id., at 593. Witt, another panel member accepted by the State but struck by the defense, said she did not know if she could give that sentence. 6 Record 2423.

 The Court of Appeals also found ambivalence in Warren’s statement, when asked how he felt generally about the death penalty, that, “there are some cases where I would agree, you know, and there are others that I don’t.” App. 202.2 (quoted in 361 F. 3d 849, 857 (CA5 2004)). But a look at Warren’s next answers shows what he meant. The sorts of cases where he would impose it were those where “maybe things happen that could have been avoided,” such as where there is a choice not to kill, but he would not impose it for killing “in self[-]defense sometimes.” App. 202.2-202.3. Where the death penalty is sought for murder committed at the same time as another felony, Warren thought that it “depends on the case and the circumstances involved at the time.” Id., at 204. None of these responses is exceptionable. A number of venire members not struck by the State, including some seated on the jury, offered some version of the uncontroversial, and responsible, view that imposition of the death penalty ought to depend on the circumstances. See Joint Lodging 176 (Marie Mazza, a seated juror); id., at 223 (Filemon Zablan, a seated juror); App. 548 (Colleen Moses, struck by the defense); id., at 618 (Mary Witt, struck by the defense); 11-(B)*Record 4455-4456 (Max O’Dell, struck by the defense).

 There were other black members of the venire struck purportedly because of some ambivalence, about the death penalty or their capacity to impose it, who Miller-El argues must actually have been struck because of race, none of them having expressed any more ambivalence than white jurors Mazza and Hearn. We think these are closer calls, however. Edwin Rand said at points that he could impose the death penalty, but he also said “right now I say I can, but tomorrow I might not.” App. 265 (alteration omitted). Wayman Kennedy testified that he could impose the death penalty, but on his questionnaire and voir dire, he was more specific, saying that he believed in the death penalty for mass murder. Id., at 317; Joint Lodging 46. (Arguably Fernando Gutierrez, accepted by the prosecution, expressed a similar view when he offered as an example of a defendant who merited the death penalty a “criminally insane” person who could not be rehabilitated. App. 777. But perhaps prosecutors took *253 Gutierrez to mean this only as an example.) Roderick Bozeman stated that he thought he could vote for the death penalty but he didn’t really know. Id., at 145. Finally, Carrol Boggess expressed uncertainty whether she could go through with giving the death penalty, id., at 298-299, although she later averred that she could, id., at 302-304.
We do not decide whether there were white jurors who expressed ambivalence just as much as these black members of the venire panel. There is no need to go into these instances, for the prosecutors’ treatment of Fields and Warren supports stronger arguments that Batson was violated.

 The procedure is conducted under Tex. Code Crim. Proc. Ann., Art. 35.11 (Vernon Supp. 2004-2005). While that statute says that the court clerk is to conduct a shuffle on the request of either party, the transcripts in this case make clear that each side did its own shuffles. See, e. g., App. 124.

 Of the first 10 panel members before the prosecution shuffled, 4 were black. Of the second 10, 3 were black. Of the third 10, 2 were black, and only 1 black was among the last 10 panel members. 2 Record 837.

 The Court of Appeals declined to give much weight to the evidence of racially motivated jury shuffles because “Miller-El shuffled the jury five times and the prosecutors shuffled the jury only twice.” 361 F. 3d, at 855. But Miller-El’s shuffles are flatly irrelevant to the question whether prosecutors’ shuffles revealed a desire to exclude blacks. (The Appeals Court’s statement was also inaccurate: the prosecution shuffled the jury three times.)

 So fax as we can tell from the voluminous record before us, many of the juror questionnaires, along with juror information cards, were added to the habeas record after the filing of the petition in the District Court. See Supplemental Briefing on Batson/Swain Claim Based on Previously Unavailable Evidence, Record in No. 00-10784 (CA5), p. 2494. The State raised no objection to receipt of the supplemental material in the District Court or the Fifth Circuit, and in this Court the State has joined with Miller-El in proposing that we consider this material, by providing addi *257 tional copies in a joint lodging (apparently as an alternative to a more costly printing as part of the joint appendix). Neither party has referred to the provision that the reasonableness of the state-court determination be judged by the evidence before the state court, 28 U. S. C. § 2254(d)(2), and it is not clear to what extent the lodged material expands upon what the state judge knew; the same judge presided over the voir dire, the Swain hearing, and the Batson hearing, and the jury questionnaires were subjects of reference at the voir dire. The last time this case was here the State expressly relied on the questionnaires for one of its arguments, Brief for Respondent in Miller-El v. Cockrell, O. T. 2002, No. 01-7662, p. 17, and although it objected to the Court’s consideration of some other evidence not before the state courts, id., at 28-29, it did not object either to questionnaires or juror cards. This time around, the State again relies on the jury questionnaires for its argument that the prosecution’s disparate questioning was not based on race. We have no occasion here to reach any question about waiver under § 2254(d)(2).
It is worth noting that if we excluded the lodged material in this case, the State’s arguments would fare even worse than they do. The panel members’ cards and answers to the questionnaires were the only items of information that the prosecutors had about them, other than their appearances, before reaching the point of choosing whether to employ the graphic script; if we excluded consideration of the questionnaires, the State would be left with no basis even to argue extenuation of the extreme racial disparity in the use of the graphic script.

 We confine our analysis to these sources because the questionnaires and any testimony about their answers provided the only information available to prosecutors about venire members’ views on the death penalty before they decided whether to use the graphic script.

 The dissent has conducted a similar statistical analysis that it contends supports the State’s argument that the graphic script was used to expose the true feelings of jurors who professed ambivalence about the death penalty on their questionnaires. See post, at 296-302. A few examples suffice to show that the dissent’s conclusions rest on characterizations of panel members’ questionnaire responses that we consider implausible. In the dissent’s analysis, for example, Keaton and Mackey were ambivalent, despite Keaton’s questionnaire response that she did not believe in the death penalty and felt it was not for her to punish anyone, Joint Lodging 55, and Mackey’s response that “[tjhou shall [n]ot kill,” id., at 79. But we believe neither can be fairly characterized as someone who might turn out to be a juror acceptable to the State upon pointed questioning. The dissent also characterizes the questionnaires of Vivian Sztybel, Filemon Zablan, and Dominick Desinise as revealing ambivalence. But Sztybel’s questionnaire stated that she believed in the death penalty “[i]f a person is found guilty of murder or other crime . . . without a valid defense” because “[t]hey may continue to do this again and again.” Id., at 184. She also reported that she had no moral, religious, or personal belief that would prevent her from imposing the death penalty. Ibid. Zablan stated on the questionnaire that he was able to impose the death penalty and that he supported it “[i]f it’s the law and if the crime fits such punishment.” Id., at 223. Desinise reported in voir dire that he had stated in the questionnaire his opposition to the death penalty. App. 573.

 Id., at 728 (Mackey); id., at 769 (Keaton).

 Kennedy said that he believed in the death penalty but would apply it only in an extreme case such as one involving multiple murders. Joint Lodging 46. There is no ambivalence in his questionnaire re *259 sponses. Butler’s questionnaire is not available, but she affirmed in voir dire that she had said on her questionnaire that she believed in the death penalty, that she had no moral, religious, or personal beliefs that would prevent her from imposing the death penalty, and that she had reported on her questionnaire that she “believe[d] in the death penalty only when a crime has been committed concerning a child such as beating to death or some form of harsh physical abuse and when an innocent victim’s life is taken.” 4 Record 1874 (internal quotation marks omitted); see also id., at 1906-1907.

 App. 579 (Butler); id., at 317 (Kennedy).

 Id., at 640-641 (Sztybel); id., at 748 (Zablan).

 Joint Lodging 184 (Sztybel); id., at 223 (Zablan).

 Neither questionnaire is available, but Desinise and Evans both confirmed on voir dire that on the questionnaire they stated their opposition to the death penalty. App. 573 (Desinise); id., at 626-628 (Evans).

 Id., at 573 (Desinise); id., at 626 (Evans).

 In answering the question whether she had moral, religious, or personal beliefs that might prevent her from giving the death penalty, Colleen Moses confirmed at voir dire that she said, “I don’t know. It would depend.” 3 Record 1141 (internal quotation marks omitted). Noad Vickery confirmed at voir dire that he reported on the questionnaire that he was not sure what he believed about the death penalty. 4 id., at 1611.' Fernando Gutierrez reported on the questionnaire that he believed in the death penalty for some crimes but answered “yes” to the question whether he had moral, religious, or personal beliefs that might prevent him from imposing it. Joint Lodging 231.

 App. 775 (Gutierrez); id., at 547 (Moses); 4 Record 1569 (Vickery).

 These were Linda Baker, Joint Lodging 71; Paul Bailey, id., at 63; Carrol Boggess, id., at 38; and Troy Woods, id., at 207.

 App. 294 (Boggess); id., at 652-653 (Baker); id., at 405-406 (Woods); id., at 737 (Bailey).

 The dissent posits that prosecutors did not use the graphic script with panel members opposed to the death penalty because it would only have antagonized them. See post, at 301. No answer is offered to the question why a prosecutor would take care with the feelings of a panel member he would excuse for cause or strike yet would antagonize an ambivalent member whose feelings he wanted to smoke out, but who might turn out to be an acceptable juror.

 These were John Nelson, 2 Record 625; James Holtz, id., at 1022; Moses, 3 id., at 1141; Linda Berk, id., at 1445, 1450; Desinise, App. 573; Vickery, 4 Record 1610; Gene Hinson, App. 576; Girard, id., at 624; Evans, id., at 627-628; Gutierrez, Joint Lodging 231.

 These were Desinise, App. 573; Evans, id., at 626; and Gutierrez, id., at 775.

 These were Jerry Mosley, 7 Record 2658; Baker, Joint Lodging 71; Bailey, id., at 63; Keaton, id., at 55; Mackey, id., at 79; Boggess, id., at 38; and Woods, id., at 207.

 Only Mosley did not. App. 630.

 The State puts the number of black panel members who expressed opposition or ambivalence at seven, and each received the minimum punishment ruse. Bozeman, id., at 162; Fields, id., at 187-188; Warren, id., at 213-214; Rand, id., at 270; Boggess, id., at 306-307; Kennedy, id., at 327-328; and Baker, id., at 654. Woods, the State argues, had been revealed through questioning as a supporter of the death penalty, and accordingly he was told that five years was the statutory minimum. As explained supra, at 241-252, Fields and Warren were neither ambivalent nor opposed; on our analysis of black venire members opposed or ambivalent, all received the trick question, along with two proponents of capital punishment.

 Moses confirmed at voir dire that she reported on her questionnaire that she did not know the answer to Question 58, 3 Record 1141, although she did express support for the death penalty, App. 548. She was not subjected to the manipulative script. Id., at 547. Crowson said that if there was a chance at rehabilitation she probably would not go with death. Id., at 554. The prosecution used a peremptory strike against her but did not employ the manipulative minimum punishment script. 3 Record 1232. Vickery said he did not know how he felt about the death penalty, 4 id., at 1572, but was not subjected to the manipulative script, id., at 1582. Sal-sini thought he would have a problem in the Mure if he voted to impose a death sentence, App. 593, but he was not subjected to the script, id., at 595. Mazza was worried about what other people would think if she imposed the death penalty, id., at 354-355, but was not subjected to the script, id., at 356. Witt said she did not know if she could give the death *263 penalty, 6 Record 2423, but was not subjected to the script, id., at 2439. Whaley thought that she could not give the death penalty without proof of premeditation, even though Texas law did not require it, 10 id., at 3750, but she was not subjected to the script, id., at 3768. Hearn said that the death penalty should be given only to those who could not be rehabilitated, App. 429, but she was not subjected to the script, id., at 441. The three nonblacks who expressed ambivalence or opposition and were subjected to the script were James Holtz, id., at 538; Margaret Gibson, id., at 514; and Fernando Gutierrez, 11-(B) Record 4397.

 The dissent reaches a different statistical result that supports the State’s explanation. See post, at 302-304. There are two flaws in its calculations. First, it excises from its calculations panel members who were struck for cause or by agreement, on the theory that prosecutors knew they could be rid of those panel members without resorting to the minimum punishment ruse. See post, at 303. But the prosecution’s calculation about whether to ask these manipulative questions occurred before prosecutors asked the trial court to strike panel members for cause and, frequently, before prosecutors and defense counsel would have reached agreement about removal. It is unlikely that prosecutors were so assured of being able to remove certain panel members for cause or by agreement that they would forgo the chance to create additional grounds for removal by employing the minimum punishment ruse. Second, as with its analysis of the panelists receiving the graphic script, the dissent characterizes certain panel members in ways that in our judgment are unconvincing. For example, for purposes of the minimum punishment analysis, the dissent considers Colleen Moses and Noad Vickery to be panelists so favorable to the prosecution that there was no need to resort to the minimum punishment ruse, post, at 304, yet the dissent acknowledged Moses’s and Vickery’s ambivalent questionnaire responses in its discussion of the graphic script, post, at 301.

 The material omitted from the quotation includes an excerpt from a 1963 circular given to prosecutors in the District Attorney’s Office, which the State points out was not in evidence in the state trial court. The Sparling Manual, however, was before the state court.

 The State claimed at oral argument that prosecutors could have been tracking jurors’ races to be sure of avoiding a Batson violation. Tr. of Oral Arg. 44. Batson, of course, was decided the month after Miller-El was tried.