AFFIRM; Opinion Filed March 11, 2013.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-11-00423-CR

No. 05-11-00424-CR

## JOHN PAUL CHARO, Appellant
V.
## THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 6
Collin County, Texas
Trial Court Cause Nos. 006-83297-2010 and 006-84279-2010

## OPINION
Before Justices Lang-Miers, Myers, and Lewis
Opinion by Justice Myers

Appellant John Paul Charo was convicted of terroristic threat[1] and criminal mischief,[2] and

was sentenced to concurrent terms of 365 days in jail, probated for two years, and a $2,000 fine.

He asserts the evidence is legally insufficient to support the terroristic threat conviction and, in

the appeal from the criminal mischief conviction, he contends the trial court erred by sustaining

the State's *Batson*[3] challenge. We affirm the trial court's judgments.

---

[1] Trial court cause number 006-83297-2010; appeal number 05-11-00423-CR.

[2] Trial court cause number 006-84279-2010; appeal number 05-11-00424-CR.

[3] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

## DISCUSSION

### *Sufficiency of the Evidence*

In his only issue in appeal number 05-11-00423-CR, appellant contends the evidence is insufficient to support the conviction "because the State failed to prove an essential element of the offense; namely, that appellant tried to run victim off the road."

In reviewing a challenge to the sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential element of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We defer to the jury's credibility and weight determinations because the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson,* 443 U.S. at 326; *Brown v. State,* 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

Section 22.07 of the penal code defines the offense of terroristic threat. *See* TEX. PENAL CODE ANN. § 22.07. The relevant portion of section 22.07 provides that a "person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to" "place any person in fear of imminent serious bodily injury." *Id.* § 22.07(a)(2). Additionally, an offense under subsection (a)(2) is a class B misdemeanor unless it is committed against a public servant, in which case it is a class A misdemeanor. *Id.* § 22.07(c)(2).

The information in this case alleged that appellant:

> Did then and there intentionally threaten to commit an offense involving violence to person and property, namely, murder and aggravated assault by threatening to kill Marcedes Ginn and by attempting to run Marcedes Ginn off the road with intent to place Marcedes Ginn in fear of imminent serious bodily injury.

A threat is defined as a "'declaration of intention or determination to inflict punishment, loss, or pain on another, or to injure another by the commission of an unlawful act.'" *Cook v. State*, 940 S.W.2d 344, 347 (Tex. App.—Amarillo 1997, pet. ref'd) (quoting BLACK'S LAW DICTIONARY 1480 (6th ed. 1990)). Imminent means "'[n]ear at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous.'" *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (quoting BLACK'S LAW DICTIONARY 676 (5th ed. 1979)); *Cook*, 940 S.W.2d at 347.

Conditioning a threat of harm on the occurrence or nonoccurrence of a future event does not necessarily mean the threat is not imminent. *Cook*, 940 S.W. 2d at 348. The accused's threat of violence, made with the intent to place the victim in fear of imminent serious bodily injury, is what constitutes the offense. *Id.*; *see Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. 1982). The requisite intent can be inferred from the acts, words, and conduct of the accused. *Cook*, 940 S.W. 2d at 348; *see Beltran v.. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980). The offense is complete if the accused, by his or her threat, sought as a desired reaction to place a person in fear of imminent serious bodily injury. *Cook*, 940 S.W. 2d at 348.

Appellant was charged with terroristic threat based on an incident investigated by the McKinney Police Department. Appellant and the complainant, Marcedes Ginn, were co-workers at a McKinney, Texas Walgreens in January of 2010. One day, while they were both at work, appellant pushed Ginn against the wine table, causing Ginn to fall down. Ginn testified that he believed appellant was upset over some merchandise that had been left at the front register by the store manager and various customers. When appellant relieved Ginn—he had been operating the register—at the end of his shift, appellant told Ginn to put the unchecked items back on the shelves, but he refused. Shortly after appellant pushed Ginn, he said, according to Ginn's

testimony, "Ain't no bitch. I'll kick your ass." Appellant was fired because of the altercation.

Three days after the altercation, on January 23, 2010, Ginn was driving home from work when he noticed that a vehicle appeared to be following him. The vehicle followed Ginn as he pulled into a 7-Eleven parking lot. Ginn soon recognized the car, a green Buick Oldsmobile, as the vehicle appellant normally drove, and Ginn could see that appellant was the driver. The vehicle continued to follow Ginn across an adjacent parking lot and back onto the road. When Ginn drove past his nearby house, the vehicle was still following him.

Ginn called his supervisor, Randi Guzman, at the Walgreens for help, but she did not answer the telephone. Ginn then called the store's night manager, Kathy Lange. A few minutes later, he spoke to Guzman on a second cell phone he possessed. Both managers advised Ginn to turn around and return to the store.

With appellant's car directly behind him, Ginn made a U-turn and headed back towards Walgreens. He told both managers on the phone that appellant was trying to run him off of the road. Appellant got closer to Ginn's car and when Ginn would speed up or slow down, appellant would do the same. Ginn estimated the two vehicles were no more than three to four feet apart.[4] At one point during the incident, when their two vehicles were traveling side by side, appellant yelled out his window at Ginn and said, "I'll fucking kill you nigger." Lange, meanwhile, was still on the phone with Ginn and overheard what sounded like appellant's voice screaming, "I'm going to f-ing kill you." Guzman, who was listening on the second cell phone, heard appellant say, "I'm going to kill you nigger."

As Ginn continued to drive, he feared appellant "would run me off the road and try and kill me." Ginn testified that he was in fear for his life. When he encountered a red stop light,

---

[4] During an in-court demonstration with a tape measure, Ginn later clarified his testimony and said the actual distance between the two vehicles was approximately twenty-two inches.

Ginn ran the light to get away from appellant. After that, Ginn "lost" appellant and returned to the Walgreens store, where the managers notified the police. The police took Ginn's statement and escorted him home safely. Two days later, when he was back at work, Ginn answered the telephone and heard appellant's voice, saying, "You better watch out in the parking lot tonight." Ginn replied "okay" and hung up the phone. Ginn told the manager about the conversation and was allowed to leave work early.

Appellant contends the threat in this case was not imminent because it was conditional and included no "immediate action to carry out that threat." The words "I'm going to kill you" or "I'll kill you," according to appellant's argument, "both signify a promise of future action" and are not legally sufficient, standing alone, "to show someone intended to carry out that threat imminently."

Appellant cites *Bryant v. State*, 905 S.W.2d 457 (Tex. App.—Waco 1995, pet. ref'd.) to support his argument. In that case, Bryant stated to Raulston, a county commissioner, that if he did not grade the road in front of his house the following day, "he was going to kick [Raulston's] god dam ass." *Id.* at 460. The court of appeals reversed the conviction, concluding there was no evidence Bryant had specific intent to place Raulston in fear at the time he made the statement. *Id.* at 461. Instead, the threat was conditioned on the non-occurrence of a future event. *Id.*

Appellant's reliance on *Bryant* is misplaced. In contrast to the facts in *Bryant*, there was no condition attached to the threat appellant made against Ginn, who testified that he feared for his life and believed appellant was going to run him off the road "at any time" during the incident. Moreover, Ginn's testimony that appellant had previously assaulted him, followed him home from work, drove within inches of his car, and (using a racial slur) threatened to kill him is sufficient to prove terroristic threat. Viewing the evidence under the appropriate standard, a

rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We therefore overrule appellant's issue.

### *Batson Claim*

In his only issue in cause number 05-11-00424-CR, appellant contends the trial court erred by sustaining the State's *Batson* challenge and reinstating a juror that had been struck from the panel.

Appellant was charged with criminal mischief in this case arising out of an incident that occurred approximately two months after the events of January 23, 2010. On March 21, 2010, Ginn was at a Sonic drive-in talking to a friend when appellant's car pulled up behind Ginn's vehicle. Appellant got out of his car, walked over to Ginn, and said, "So what's up now?" Ginn understood this to mean that appellant wanted to fight, and Ginn retreated to his car, locked the doors, and rolled up the windows. Appellant punched and broke the driver's side mirror of Ginn's car with his fist. According to the information that was later filed against appellant, he was charged with criminal mischief based upon the intentional and knowing damage to Ginn's property and the resulting pecuniary loss to Ginn of $500 or more but less than $1,500. *See* Texas Penal Code Ann. § 28.03(a), (b)(3)(A).

During the State's voir dire, the prosecutor asked each panel member their opinion of police officers on a scale of one to five:

> . . . . Okay. I want to ask everyone now your opinion of police officers on a scale of one to five. I want you to base this on your personal experiences with police officers and interaction you had with them in your neighborhood, things you've heard from your friends or families, that kind of thing. Just your initial reaction to police officers.
>
> One is going to be the low end, that you think they're dishonest, distrustworthy, you hate to see them coming. Five is going to be the high end, honorable position, that most of them are honorable, and you appreciate their presence in the community and the service that they do. Everybody understand

the scale, one to five?

Defense counsel later asked each panel member if they were a native Texan.

After both sides completed their voir dire and made their peremptory strikes, the trial court announced the six prospective members of the jury. The State made a *Batson* challenge against the defense for striking juror No. 7, Mr. Washington, an African-American male:

> Your Honor, I'd like to make a *Batson* challenge based on Defense Counsel striking Mr. Washington, who's an African American male, [and] was Juror No. 7 in this case. I believe based on the questions that he was asked and the answers that he gave, there was no reason for him to be struck other than his race.

When the court asked defense counsel about his rationale for striking Mr. Washington, he gave two reasons: "His opinion of the police department was a five. He wasn't from Texas, which may be my prejudice, but nonetheless, he wasn't, and those were the reasons he was struck."

The court then asked if there were other panel members struck by the defense that rated the police a "five." Defense counsel answered that he used peremptory strikes to remove two other panel members, Mrs. Hord and Mr. Salisbury. Neither side disputed that Mr. Washington, who had told defense counsel he was from Los Angeles, California, rated the police a "five," but it is unclear from the record when he made that statement.[5] According to the record, Mrs. Hord rated the police a "five-plus," was not a native Texan, and said she was originally from Iowa but had lived in Texas for almost thirty years. Mr. Salisbury rated the police a "four," was also not a native Texan, and grew up in Idaho.

After defense counsel explained his peremptory strikes, the trial court asked for a response from the State. The prosecutor told the court:

> Your Honor, Mrs. Hord was the other person who was—who Defense Counsel says he struck because she was a five. I believe her answer was that she was a five-plus. Mr. Cooper was a five, Mrs.—Mrs. Johnson was a five on

---

[5] There were several panel members who rated the police a "five" but are not identified in the record by name or juror number.

police, Mr. Dooley was also a five on police, and none of these persons were struck by Defense Counsel.

The record shows there were three panel members who rated the police a "five," were not native Texans, and were not struck by the defense: (1) Mr. Cooper rated the police a "five" and was from Macon in the "show me state"; (2) Mrs. Johnson rated the police a "five" and was from Trinidad in the West Indies; (3) Mr. Goodstein rated the police a "five" and was from Florida. Neither side addressed the circumstances regarding Mr. Goodstein. The other panel member mentioned by the State, Mr. Dooley, who ultimately served on the jury, said he was from Sherman, Texas. As for Mrs. Johnson and Mr. Cooper, defense counsel offered the following explanation:

> I didn't strike Mrs. Johnson because I—I like her responses. I think she's a mixed race. It would appear. So the African-American challenge I don't know is correct, although I didn't ask her what race she was from. And as—so that would be my answer to Mrs. Johnson. I thought she was—she was going to be somebody who would—I also didn't believe she was going to be the one that ended up being the foreman anyway. So I thought, in her case, she was going to be someone that would follow the jury.
> As far as Mr. Cooper goes, he has a previous assault charge against him, so that's why he wasn't struck, because he believed the police didn't treat him fairly in the assault case.

Regarding Mr. Cooper, counsel added, "Well, I thought he would be a good juror on that, being accused of an assault, understanding people can be falsely accused, even if he was treated fairly."

The trial court sustained the State's *Batson* challenge, finding there was no race-neutral reason for striking Mr. Washington given the fact that there were other panel members who matched the same circumstances for which he was alleged to have been struck:

> I will sustain the *Batson* challenge. I do not find that there is a race-neutral basis having a prima fascia case made for eliminating Mr. Washington, given the fact that there were other jurors who were seated on the jury that matched the same circumstances in which he was alleged to have been stricken.

The court removed the last seated juror and placed Mr. Washington on the jury. Mr. Washington

served as the presiding juror and appellant was found guilty of criminal mischief.

The following three-step process applies to a *Batson* challenge: (1) the opponent of the strike must make a prima facie showing of racial discrimination; (2) the burden then shifts to the proponent of the strike to articulate a race-neutral reason for the strike; and (3) the trial court must decide whether the opponent has proved purposeful racial discrimination. *See Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *see also Greer v. State*, 310 S.W.3d 11, 14 (Tex. App.—Dallas 2009, no pet.) (citing *Watkins v. State*, 245 S.W.3d 444, 448-49 (Tex. Crim. App. 2008)).

When reviewing a *Batson* challenge, we examine the record in the light most favorable to the trial court's ruling and reverse only when it is clearly erroneous. *See Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); *Bausley v. State*, 997 S.W.2d 313, 315 (Tex. App.—Dallas 1999, pet. ref'd). A ruling is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction a mistake has been committed. *Greer*, 310 S.W.3d at 13. "If the trial judge's decision is plausible in light of the record viewed in its entirety, or if the judge chose between two permissible views of the evidence, we may not reverse even if we are convinced that we would have decided the matter differently had we been sitting as the trier of fact." *Id.* at 13-14. We give great deference to the trial court's decision on the issue of purposeful discrimination because it requires an assessment of the credibility and content of the proponent's reasons and all other relevant facts and circumstances. *See Alexander v. State*, 866 S.W.2d 1, 8 (Tex. Crim. App. 1993).

Appellant contends the trial court did not use any of the factors set forth in *Miller-El v. Dretke*, 545 U.S. at 231, which are as follows:

- whether the party eliminated a far greater proportion of African–American veniremembers than non-African-American veniremembers;

- whether the party's stated reasons for striking the African–American veniremembers would apply equally to non-African-American veniremembers that the party did not strike;

- whether the party used a jury shuffle in a manner that appeared racially discriminatory;

- whether the party disproportionately singled out African–American veniremembers for voir-dire questioning in a way designed to elicit grounds for peremptory challenges; and

- whether the party employed a formal policy to exclude minorities from jury service at the time of trial.

*Greer*, 310 S.W.3d at 14-15 (citing *Watkins*, 245 S.W.3d at 448-49 (summarizing *Miller-El*, 545 U.S. at 240-64)).

The court of criminal appeals has noted that the *Miller-El* factors are "non-exclusive." *Watkins*, 245 S.W.3d at 449. It has also identified other potentially relevant factors. *See Whitsey v. State*, 796 S.W.2d 707, 713-14 (Tex. Crim. App. 1989). There is no requirement of which we are aware that a trial court reviewing a *Batson* challenge must analyze each and every potentially relevant factor. The "clearly erroneous" standard of review we follow in cases such as these "is a highly deferential standard because the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral." *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). Moreover, the court in this case necessarily did a side-by-side comparison when it evaluated the answers of Mr. Washington, Mr. Cooper, and Mrs. Johnson. *See Miller-El*, 545 U.S. at 241 (discussing various factors including "side-by-side" comparisons of venire members struck by the prosecution with those who were

not).

Appellant also argues that the trial court should have denied the *Batson* challenge based on the "mixed motives" approach of *Guzman v. State*, 85 S.W.3d 242 (Tex. Crim. App. 2002). In *Guzman*, the State offered reasons for its peremptory strike that were both gender-based and gender-neutral. *See id.* at 245. The court of criminal appeals concluded that when motives behind a peremptory strike were both impermissible (race or gender based) and permissible (race or gender neutral), if the striking party showed he would have struck the juror based solely on the neutral reasons, "then the strike does not violate the juror's Fourteenth Amendment right to equal protection of the law." *Id.* at 244. But the facts of this case contrast with *Guzman* because defense counsel never suggested race was one of the reasons Mr. Washington was struck.

A side-by-side comparison of the answers provided by Mr. Washington, Mr. Cooper, Mrs. Johnson, and Mr. Goodstein supports the trial court's finding of purposeful racial discrimination. In the case at bar, when the trial court asked for a response from the State, the prosecutor pointed to two panel members, Mr. Cooper and Mrs. Johnson, who had rated the police as a "five," were not native Texans, and had not been struck by the defense. Defense counsel argued he did not strike Mrs. Johnson because he "liked her responses" and "didn't believe she was going to be the one that ended up being the foreman anyway." Counsel said he did not strike Mr. Cooper because he "thought he would be a good juror based on that, being accused of assault, understanding people can be falsely accused, even if he was treated fairly." But another panel member not struck by the defense, Mr. Goodstein, also rated the police as a "five" and was not a native Texan.

As we noted earlier, we will sustain a court's ruling on a *Batson* challenge unless it is clearly erroneous. *Greer*, 310 S.W.3d at 13. It was the trial court in this case that heard defense

counsel's explanations for his strikes, saw his demeanor as he conducted both the voir dire and his response during the *Batson* hearing, and observed the venire members during the voir dire process. Deference to the trial court's findings makes particular sense in this context because the court was in the best position to evaluate the strike proponent's demeanor and credibility:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence will often be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York*, 500 U.S. 352, 365 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see also Miller–El v. Cockrell*, 537 U.S. 322, 339 (2003) ("Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations."). Considering, therefore, all of the relevant circumstances, we conclude the trial court's ruling was not clearly erroneous. We overrule appellant's issue.

We affirm the trial court's judgments.


_____
LANA MYERS
JUSTICE


Do Not Publish
TEX. R. APP. P. 47
110423F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN PAUL CHARO, Appellant

No. 05-11-00423-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
No. 6, Collin County, Texas
Trial Court Cause No. 006-83297-2010.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of March, 2013.

_____
LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JOHN PAUL CHARO, Appellant

No. 05-11-00424-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
No. 6, Collin County, Texas
Trial Court Cause No. 006-84279-2010.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 11th day of March, 2013.

_____
LANA MYERS
JUSTICE