EDITH BROWN CLEMENT, Circuit Judge,
dissenting:
A mixed-race jury convicts a defendant of a heinous capital crime, and through its questionable characterization of certain essential facts, disregarding of others, and misreading of binding precedent, the majority finds invidious racial discrimination against black prospective jurors where none existed. The result not only unfairly tarnishes an individual prosecutor’s reputation, it also puts an impossible burden on all prosecutors and makes application of the Batson test more difficult going forward. I respectfully dissent.
A. Makeup of the Jury
The majority makes much of the fact that, within a very small sample space, the prosecution struck a higher percentage of prospective black jurors from the venire than white jurors. The majority is not mistaken as a mathematical matter, but it does paint a misleading picture by ignoring those statistical facts that do not support its conclusions. The majority notes, for example, that black jurors made up “31% of qualified prospective jurors,” but downplays the essential fact that the prosecution ultimately tendered four black jurors which — had all four been accepted by the defense — would have constituted 28.5% of the jury (including the two alternates). Thus, the jury eventually tendered by the prosecution was a near-perfect representation of the racial makeup of the venire from which it was chosen.
In attempting to waive off this inconvenient statistical truth, the majority states in a footnote that, because the fourth black juror was tendered by the prosecution after eleven jurors had been seated, that fourth juror would not have been considered were it not for the defense itself striking two black jurors tendered by the prosecution. But the defense did strike the black jurors, and the prosecution did tender four black prospective jurors. The majority attempts to avoid these facts by referencing a footnote in Miller El II to conclude “that the defense striking] some black jurors is not relevant to the prosecutor’s pattern of discriminatory strikes.” But the cited footnote in Miller-El II explains that whether the defense strikes a white juror has no bearing on the question of whether the prosecution discriminated in its use of strikes against black jurors. See Miller-El II, 545 U.S. 231, 244-45 n.4, 125 S.Ct. 2317 (2005) (explaining that the defense striking white juror Witt was “not relevant” to the question of whether the prosecution’s proffered race-neutral reasons for striking a black juror were pre-textual). Here, by contrast, the defense striking some black jurors who had been tendered by the prosecution is relevant to the particular question of how many black jurors were ultimately tendered by the prosecution in total, because the defense’s strikes clearly impacted the way the prosecution went about exercising its strikes going forward.
And, in any case, even if the fourth black juror is not counted, the prosecution still tendered a jury that was 25% black. To believe the majority, then, is to believe that the prosecution decided to racially discriminate against black jurors — but only to the extent necessary to reduce proportional representation on the jury from 31% to 25%. Tepid invidious discrimi *672 nation indeed.[1]
B. Side-By-Side Comparison
More egregious errors of law and fact permeate the majority’s discussion of the district court’s side-by-side comparison of jurors Sturgis and Minor (black) with Cooper (white).
When asked to give race-neutral reasons for striking Sturgis and Minor, the prosecution pointed to their answers to questions 30, 34, and 35 on the juror questionnaire. Both Sturgis and Minor answered all three questions in ways that indicated they might be uncomfortable rendering a guilty verdict resulting in the death penalty, or hold the prosecution to a higher burden of proof than is legally required. The majority cannot — and does not — dispute that the prosecution’s proffered explanations are plausible and race-neutral on their face. Instead, the majority turns to the questionnaire of a white juror, Cooper, who answered questions 30, 34, and 35 in the same way as Sturgis and Minor but who was not struck by the prosecution. From this fact alone the majority concludes “that the prosecutor’s reason for striking Sturgis and Minor could not have been their answers to [the three questions]. Otherwise, he would not have accepted Cooper who has the same answers the prosecution did not like.”
But if Cooper gave answers to other questions that might have alleviated the prosecution’s concerns regarding his answers to questions 30, 34, and 35, then the majority’s conclusion simply does not follow. And that is precisely what happened here. Cooper answered question 53, which asked jurors to circle the response that best matched their opinion on the death penalty, by circling “Strongly Favor” and then writing in by hand “for rape, murder, child abuse, [and] spousal abuse.” Sturgis and Minor, by contrast, circled “Generally Favor” and “No Opinion,” respectively. Reviewing the record in its totality, then, shows that the most logical explanation for the prosecution’s not striking Cooper was not because he was white while Sturgis and Minor were black, but because Cooper was a more favorable juror based on his answers to other questions on the questionnaire.
Indeed, the district court acknowledged that Cooper was a more desirable juror for the prosecution, yet refused to consider that fact in its analysis of the prosecution’s supposedly discriminatory intent because Cooper’s answer to question 53 “was not a rationale offered by the prosecutor.” The majority agrees with the district court on this point, citing to Miller-El II for the proposition that prosecutors may not “justify their strikes based on reasons not offered during jury selection.” On this point, the majority simply misreads the Supreme Court’s directive in Miller-El II.
It is true that, as the majority emphasizes, the Court explained in Miller-El II *673 that a “prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.” Miller-El II, 545 U.S. at 252, 125 S.Ct. 2317. But that does not mean that a reviewing court is prohibited from looking through the record to decide whether the proffered explanations are, in fact, plausible. Indeed, as the Court also explained, when a prosecutor gives a reason for striking a black juror, a reviewing court must “assess the plausibility of that reason in light of all evidence with a bearing on it.” Id. at 251-52, 125 S.Ct. 2317 (emphasis added). That makes perfect sense—it would be quite strange to suggest that a court must decide the plausibility of a given race-neutral explanation, but is not allowed to study the record evidence necessary to make that determination.
In Chamberlin’s case, Cooper’s answer to question 53 is not a new post-facto explanation invented by the prosecution. It is rather evidence “bearing on” the essential question here: whether or not Sturgis and Minor’s answers to 30, 34, and 35 could plausibly have been the reason why they were struck. That Cooper offered answers to other questions which logically could have assuaged any concerns the prosecution may have had regarding his answers to those specific three questions undermines the majority’s conclusion that the prosecution’s proffered race-neutral explanations were pretextual. This is precisely the type of evidence courts should consider in making that determination.
The majority argues that “citing different answers to the same question as a reason for keeping one juror is the same as saying the difference was a reason for striking the other juror.” The majority is mistaken. Consider this hypothetical, which closely tracks the scenario before us here:
1. Prosecutor decides, as a default position, to strike all jurors who express concerns about the legal burden of proof.
2. Prosecutor reviews juror questionnaires and notes that Jurors A, B (both black) and C (white) have expressed concerns about the legal burden of proof. Consequently, Prosecutor intends to strike all three by default.
3. Upon further review, Prosecutor notes that Juror C alone strongly favors the death penalty. Because this is a capital case, Prosecutor decides to make an exception to the default rule and retain Juror C because of his favorable death penalty views.
4. Prosecutor strikes Jurors A and B as planned. Responding to a Batson challenge, Prosecutor explains that A and B both expressed concerns about the legal burden of proof.
5. Prosecutor never mentions white Juror C because the law does not require Prosecutor to explain why he decided to keep any specific juror.
Applying the majority’s reasoning, Juror Us answer to an entirely separate question must count as a reason why Jurors A and B were struck. The majority would therefore require our hypothetical Prosecutor to explain, to the trial court his reasons for keeping white Juror C, or else be vulnerable to the accusation that he invidiously discriminated against Jurors A and B because they were black. That is not what Miller-El II requires.
Furthermore, although the majority stresses one passage in Miller-El II, it does not properly consider the rest of that opinion. The Miller-El II Court admittedly acknowledged that side-by-side comparisons can provide useful “evidence tending to prove purposeful discrimination,” but it *674 emphatically did not rely exclusively or even primarily on strict side-by-side comparisons in concluding that the prosecution had discriminated against black prospective jurors. Id. at 241, 125 S.Ct. 2317. The Court emphasized that the prosecution in Miller-El II had: (1) intentionally “mis-characterized” the testimony of a black juror who would otherwise have been an “ideal juror in the eyes of a prosecutor seeking a death sentence” to exercise a strike against him, id. at 244, 247, 125 S.Ct. 2317; (2) used a “jury shuffle” to move black jurors to the end of the voir dire line, see id. at 253, 125 S.Ct. 2317; (3) used differently-worded questions for black jurors designed to elicit responses indicating a negative feeling towards the death penalty, see id. at 255-60, 125 S.Ct. 2317; (4) in some cases used what the Court itself called “trickery” in asking questions designed to create cause to strike black jurors, see id. at 261-63, 125 S.Ct. 2317; and (5) had “for decades” prior to the case “systematically exclude[d] blacks from juries.” Id. at 263, 125 S.Ct. 2317.
Absolutely none of these other indicators of discriminatory intent that the Miller-El II Court relied on are present in Chamberlin’s case. Indeed, so far as I can tell, the entirety of the majority’s conclusion rests on (1) a tendentious statistical account of a tiny sample space, and (2) comparing the answers to three questions out of dozens in a questionnaire by three jurors out of a pool of 42. It is unlikely that such evidence would be sufficient on de novo review; to suggest that it constitutes clear and convincing evidence that the state court’s factual determination was unreasonable is to render entirely meaningless that standard of review.
The practical import of the majority’s holding for future prosecutors seeking to avoid charges of racial discrimination reveals the untenability of the majority’s ruling. The majority refuses to listen to any argument from the prosecution as to why it did not strike Cooper because such evidence was not raised during jury selection. But, as I noted above, there was no reason for the prosecution to provide detailed reasons for why it decided not to strike him— because Cooper was not a black juror who was being struck.[2] In other words, to avoid the result reached by the majority here, during jury selection the prosecution would not only have had to explain why it struck specific black jurors — as it did — but also why it did not strike all white prospective jurors as well. There is nothing in Batson, Miller-El II, or any other case that compels anything of the sort.
Even worse, the majority’s opinion has the perverse effect of incentivizing prosecutors to be less detailed when giving their race-neutral reasons for striking black jurors. What if the prosecution in Chamber-lin’s case had not honestly pointed to the specific answers on Sturgis’s and Minor’s questionnaires which gave the government pause? Imagine instead that the prosecution simply stated that Sturgis’s and Minor’s “answers to the jury questionnaire as a whole” had led the prosecution to believe “that they were likely to apply an incorrect standard of review and were uncomfortable with the death penalty.” In such a case, the formalistic side-by-side compari *675 son the majority engages in here would be impossible. To insulate themselves from accusations of racism, savvy prosecutors will recognize that the more general their proffered race-neutral reasons are, the harder it will be for an overzealous reviewing court to poke holes in them later.
[[Image here]]
To be told by a court of law that you have engaged in invidious racial discrimination is no small thing. To be told that you may not offer essential evidence to defend against the charge is even worse. With its opinion, the majority sends a stern message indeed to future prosecutors: be sure to explain out loud not just every peremptory strike but also every non-strike at jury selection, or else be labelled a racist by the very courts to which you have devoted your career.[3] I would strongly urge my colleagues to reconsider whether that is truly the message we want to send.

. The majority argues that these numbers are irrelevant and that the more useful method is to divide the number of black jurors proffered by the total number of jurors proffered. Of course, this calculation suffers from precisely the same malady the majority claims to identify in my calculation: there is no such thing as a twenty-four person jury, so the total number of jurors proffered is not relevant. Had the defense accepted all of the prosecution’s proffered jurors, applying the trial court’s jury selection method, the jury includ-mg alternates would have included four black members, or 28.5% of the total. And, even accepting dubitante the majority’s premise, the prosecution ultimately proffered a jury pool of twenty-four that was 16.67% black (4/24). Thus, granting the majority’s strained reasoning, the prosecution evidently was motivated by racial animus to the extent necessary to reduce black representation in the jury pool from 31% to 16.67%. I reiterate: tepid invidious discrimination indeed.

. The district court’s suggestion that the prosecution could have “augment[ed] the record” to explain why it wanted to keep Cooper is absurd as a practical matter. Such a rule would compel the prosecution to reveal to the defense key parts of its trial strategy by forcing the prosecution to explain why it favored certain jurors for the case. Furthermore, there is nothing in any precedent from the Supreme Court or this court suggesting that the Batson burden-shifting scheme puts any responsibility on the prosecution to explain why it did not strike white jurors.

. The majority suggests in a footnote that being accused of striking jurors on the basis of their race is not the same as being called a racist, because a prosecutor may simply be trying to "us[e] demographics to predict juror behavior.” This distinction is facile: the premise underlying the use of race to predict juror behavior — that the color of one’s skin can be relied upon to predict how one will view a given piece of evidence or evaluate certain testimony — is itself fundamentally racist. To be told as a Prosecutor that you have engaged in such shenanigans is, again, no small thing.