# SUPREME COURT OF THE UNITED STATES

## TONY TERRELL CLARK *v.* MISSISSIPPI

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI

No. 22–6057.   Decided June 30, 2023

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of certiorari.

Just a few years ago, this Court took an admirable stand to defend its landmark decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). *Batson* plays a vital role in preserving the integrity of our judicial system by ensuring that people are not prevented from serving as jurors because of their race. Yet not all courts were heeding *Batson*'s command. In particular, the Mississippi Supreme Court rejected evidence that a juror was struck based on his race in a death penalty case, where the stakes could not have been higher. In reversing that decision, this Court emphasized the importance of "vigorously enforc[ing] and reinforc[ing]" *Batson* and the need to "guar[d] against any backsliding." *Flowers* v. *Mississippi*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 16). That decision was a powerful articulation of the equal protection principles that *Batson* vindicates.

In defending *Batson*, this Court was not just protecting the rights of criminal defendants. *Flowers* also safeguarded the rights of other Black Mississippians, who were being denied the chance to fulfill their civic duty of serving as jurors in trials of their peers. "Other than voting," *Flowers* explained, such jury service "is the most substantial opportunity that most citizens have to participate in the democratic process." 588 U. S., at \_\_\_ (slip op., at 7). Nor is the

harm of *Batson* erosion limited to minority groups, as *Batson* is crucial to "public confidence in the fairness of the criminal justice system." 588 U. S., at ___ (slip op., at 16). Simply put, when people are prevented from serving as jurors based on their race, it is a stain on our justice system.

*Flowers* made sure that lower courts understood how to apply *Batson* properly by expressly identifying factors that are relevant to the *Batson* analysis. These include "statistical evidence" of racial disparities in strikes, "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors," and "a prosecutor's misrepresentations of the record when defending the strikes." 588 U. S., at ___–___ (slip op., at 16–17). The Mississippi Supreme Court's misapplication of these and other factors warranted reversal in *Flowers*. *Id.*, at ___ (slip op., at 31).

Apparently *Flowers* was not clear enough for the Mississippi Supreme Court, however. In yet another death penalty case involving a Black defendant, that court failed to address not just one but three of the factors *Flowers* expressly identified. This was a direct repudiation of this Court's decision. This can only be read as a signal from the Mississippi Supreme Court that it intends to carry on with business as usual, no matter what this Court said in *Flowers*. By allowing the same court to make the same mistakes applying the same standard, this Court acquiesces in the Mississippi Supreme Court's noncompliance. Today, this Court tells the Mississippi Supreme Court that it has called our bluff, and that this Court is unwilling to do what is necessary to defend its own precedent. The result is that *Flowers* will be toothless in the very State where it appears to be still so needed. I therefore respectfully dissent.

I

During jury selection in this case, petitioner Tony Terrell Clark twice raised *Batson* challenges based on a pattern of

racial disparities in the prosecution's strikes. This triggered the familiar "three-step process for determining when a strike is discriminatory." *Foster* v. *Chatman*, 578 U. S. 488, 499 (2016). At the first step, the trial court twice found that Clark had satisfied his burden, which requires "a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Ibid.* (internal quotation marks omitted). For the second step, the trial court required the prosecution to provide race-neutral justifications. At the third step, the trial court concluded that Clark had not shown purposeful discrimination.

Later, when the jury was deliberating about appropriate punishment, it had trouble reaching consensus. On the second day of deliberations, the jury sent out a note stating they were "'unable to agree unanimously on punishment'" and asking what would happen if they could not agree. 343 So. 3d 943, 1010–1011 (Miss. 2022) (Kitchens, P. J., dissenting). After the trial court declined to inform the jury of the consequences of disagreement, and after more hours of deliberation, the jury finally agreed on a verdict of death. *Ibid.* A fractured Mississippi Supreme Court affirmed over two separate dissents by Presiding Justice Kitchens and Presiding Justice King. Both dissents were joined by a third Justice, Justice Ishee.

## II

Petitioner presented substantial evidence that the prosecution had engaged in racially motivated strikes. This evidence tracked the factors this Court identified as important in *Flowers*. Instead of engaging in the requisite context-specific inquiry, however, the majority below never addressed this evidence in its *Batson* analysis. That should make this an easy case. Because of this plain legal error, there is no need for this Court to engage in *Batson*'s fact-dependent inquiry. Instead, this Court could merely vacate the judgment below and direct the Mississippi Supreme

Court to conduct that analysis properly in the first instance. That appears to be too much for this Court today.

The majority below ignored three *Flowers* factors in its analysis. First, the majority did not address jarring statistical disparities. *Flowers* spoke plainly on this point: When the statistics show that the State struck Black jurors at a significantly higher rate than white jurors, that is "evidence suggesting that the State was motivated in substantial part by discriminatory intent." 588 U. S., at ___ (slip op., at 23). Here, approximately 34.5 percent of the members of the initial venire were Black. 343 So. 3d, at 1015 (King, P. J., dissenting). After the State had used all of its peremptory strikes, however, "[t]he jury ultimately consisted of eleven white jurors, one black juror, and two white alternate jurors." *Ibid.* Black jurors had thus dwindled down to 7 percent. To get there, at the peremptory strike stage, the State struck seven out of the eight remaining Black prospective jurors, or "87.5 percent of the black jurors it encountered and only 16.7 percent of the white jurors." *Ibid.* In other words, the State was over five times more likely to strike a Black prospective juror than a white one.

These are the kinds of numbers that in the past this Court has found to be evidence of discrimination. For example, the Court found there was statistical evidence of discrimination when an initial venire panel was 18.5 percent Black, the peremptory strike rate of eligible Black venire members was 91 percent, and only one Black juror ended up on the jury. See *Miller-El* v. *Dretke*, 545 U. S. 231, 240–241 (2005). These numbers are quite similar to those here.

Just as in *Miller-El*, the fact that the State allowed a single Black juror to serve does not undermine these statistics. To the contrary, this Court has on several occasions "skeptically viewed the State's decision to accept one black juror" as "an attempt 'to obscure the otherwise consistent pattern of opposition to' seating black jurors." *Flowers,* 588 U. S., at ___ (slip op., at 22) (quoting *Miller-El*, 545 U. S., at 250).

That same skepticism is more than warranted here, where the State appears to have struck as many Black prospective jurors as it thought it could get away with.

The majority below responded to these telling statistics with an equally telling silence, failing even to mention them in its *Batson* analysis. There is simply no way to square this with *Flowers*.

Second, the majority below failed to engage with the fact that the State conducted special investigations into some of the most qualified Black prospective jurors in an attempt to disqualify them. "[T]his Court's cases explain that disparate . . . investigation of prospective jurors on the basis of race" can be evidence of racially motivated strikes. *Flowers*, 588 U. S., at ___ (slip op., at 25). When Clark raised his *Batson* challenges, the State sought to justify its strikes with the results of two previously undisclosed investigations it had conducted into two of the Black prospective jurors. Specifically, the State had run database searches and compiled printouts showing people with criminal records who happened to have the same last names as the Black prospective jurors.

For prospective juror Kathy Luckett, a Black woman, the State's investigation detailed all the "'felony convictions and charges we have on Lucketts in the . . . area.'" 343 So. 3d, at 958. The State presented no evidence that any of these individuals were actually related to Kathy Luckett, and "under oath, Luckett indicated that she did not have any close family members who had been prosecuted for a felony." *Id.*, at 1022 (King, P. J., dissenting). During *voir dire*, the State never questioned Luckett about any such family ties, which could have revealed whether these supposedly disqualifying ties even existed. See *Flowers*, 588 U. S., at ___ (slip op., at 28) ("'[F]ailure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination'");

*ibid.* (noting failure to "ask individual follow-up questions to determine the nature of [a supposedly relevant] relationship").

The exact same thing happened with prospective juror Alicia Esco-Johnson, another Black woman. To justify its strike, the State again "show[ed] all the felony convictions and charges it had on the name Esco in Madison County." 343 So. 3d, at 957. Once again, Esco-Johnson had indicated under oath that she did not have any close family members who had been prosecuted for felonies, and once again, the State never brought up potential family ties in questioning her.

As *Flowers* explained, by "conducting additional inquiry into th[e] backgrounds" of only Black jurors, "a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify what is in reality a racially motivated strike." 588 U. S., at ___ (slip op., at 25). Then at the same time, "[p]rosecutors can decline to seek what they do not want to find about white prospective jurors." *Ibid.* This case is a perfect illustration. "No evidence exists that the State had investigated similarly situated white jurors it accepted." 343 So. 3d, at 1016 (King, P. J., dissenting). This closely mirrors *Flowers*, where "[t]he State apparently did not conduct similar investigations of white prospective jurors." 588 U. S., at ___ (slip op., at 24). Indeed, the State here accepted white prospective jurors without questioning them about family members that they admitted had been arrested or prosecuted, or were currently incarcerated. This included close family members, such as one prospective juror's stepson.

Further, the State had asserted during jury selection that when it came to family ties, it was only interested in whether "a close family member [had] ever been charged with a felony," not a "third cousin twice removed that you see every fifth year at the family reunion." Tr. 394. Yet for these two Black prospective jurors, similar last names were

sufficient for the prosecutor to disqualify them from service.

The majority once again responded to this pattern of disparate treatment with silence. Its *Batson* analysis did not address the fact that the State only carried out special investigations into two Black jurors, the State's inconsistent assertion that it was uninterested in extended family, or the oddity of treating people with similar names as family while never actually questioning the prospective jurors about extended family. Once again, this silence alone would be sufficient to vacate the judgment below, as *Flowers* could not have been clearer: "A court confronting that kind of pattern cannot ignore it." 588 U. S., at \_\_\_ (slip op., at 25).

Third, the majority failed to address the State's "misrepresentations" when it was "defending the strikes." *Id.*, at \_\_\_ (slip op., at 17). In justifying its strikes of Black prospective jurors, the State stated it was "not accepting anybody that equivocates on their questionnaire on the death penalty." Tr. 1587. Yet not only did the State accept white jurors who equivocated about the death penalty, the State accepted jurors who evinced far more reluctance to impose the death penalty than Black jurors it struck on that very same ground. See *Foster*, 578 U. S., at 505 (prosecutor's explanations were "difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered [a Black juror] an unattractive juror").

For example, Question 36 on the juror questionnaire asked about views on capital punishment, to which answers ranged from A (most opposed) to E (most supportive). Luckett, one of the Black women who was struck, answered "D," the second most pro-death penalty answer: "in favor of capital punishment except in a few cases where it may not be appropriate." 343 So. 3d, at 956, n. 2. At *voir dire*, she testified she would impose the death penalty if the law and facts called for it, which would depend on the case. The

prosecution explained that it struck her because her answers supposedly showed she was insufficiently supportive of capital punishment.

Yet a white juror the prosecution did not strike answered "B," the second most anti-death penalty answer: "opposed to capital punishment except in a few cases where it may be appropriate." *Ibid.* He also stated that it should "'only be an option for extremely heinous cases.'" *Id.*, at 968. On further questioning he "spoke of his involvement in prison ministries," "cried . . . in speaking about it," and reaffirmed that the death penalty "'should only be done in extreme cases.'" *Id.*, at 1021 (King, P. J., dissenting). Two other white prospective jurors that the government did not strike also answered "B." *Id.*, at 1021–1022. One of these jurors stated that "'I am more for a life sentence as opposed to the death penalty,'" *id.*, at 969 (majority opinion); the other stated that the death penalty was only appropriate for "particularly vicious," "evil," and "heinous" crimes, Tr. 1270. Two additional white jurors answered "C," indicating they were "'neither generally opposed to nor in favor of capital punishment,'" and that it would depend on the case. 343 So. 3d, at 1021–1022 (King, P. J., dissenting).

The majority never explained how the State's decision not to strike these white jurors could be squared with the State's categorical assertion that it would not accept "anybody" who even "equivocate[d]" as to "the death penalty." Tr. 1587. The record reveals a double standard where the State struck Black jurors who took anything but the most hardline pro-death penalty position, but not white jurors who expressed serious doubts about the death penalty.

## III

The failure of the court below to engage with several factors expressly identified in *Flowers* cannot stand if *Batson* is to retain its force in the State of Mississippi. This Court has "made it clear" beyond any room for doubt "that . . . in

reviewing a ruling claimed to be [a] *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Foster*, 578 U. S., at 501 (internal quotation marks omitted). This requires "a sensitive inquiry into such circumstantial . . . evidence of intent as may be available." *Ibid.* (internal quotation marks omitted). Relevant evidence with respect to some jurors can also place evidence about other jurors in a different light. Failing to consider the challenged strikes "in the context of all the facts and circumstances" is thus entirely inconsistent with *Batson. Flowers*, 588 U. S., at \_\_\_ (slip op., at 30).

While the majority's silence as to each one of these factors would be sufficient to vacate the judgment below, the cumulative effect cries out for intervention by this Court. To take just one example, the only reasons the State gave for striking Luckett were the list of people with the same last name and her views about the death penalty. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose," *id.*, at \_\_\_ (slip op., at 18), yet the court below did not even address the serious concerns about both of those justifications, especially in light of the grievous statistical disparity between strikes of Black and white prospective jurors.

Summary disposition is warranted when the decision below "was not just wrong" but "committed fundamental errors that this Court has repeatedly admonished courts to avoid." *Sexton* v. *Beaudreaux*, 585 U. S. \_\_\_, \_\_\_ (2018) (*per curiam*) (slip op., at 7). Here, the Mississippi Supreme Court was not just wrong, but wrong in the very same way it had been wrong just a few years ago. The absence of important evidence from the majority's analysis meant it "either failed to analyze such evidence" or saw it as "insignificant," neither of which would be consistent with the "careful, context-specific analysis" clearly required by this Court's precedent. *Lombardo* v. *St. Louis*, 594 U. S. \_\_\_, \_\_\_ (2021) (*per curiam*) (slip op., at 4). In such situations, this

Court has "grant[ed] the petition for certiorari, vacate[d] the judgment" and "remand[ed] the case to give the court the opportunity to employ" the proper inquiry. *Ibid.*

Today, however, this Court is unwilling to take even that modest step to preserve the force of its own recent precedent. It is the people of Mississippi who will pay the price of this inaction. Defendants like Clark will watch as they are condemned by juries that may have been racially gerrymandered. Prospective jurors like Kathy Luckett, a nursing aide and mother, will learn that the color of their skin might deprive them of the right to sit as jurors in judgment of their peers. Finally, courts throughout the State will take note and know that this Court does not always mean what it says.

\*      \*      \*

Because this Court refuses to intervene, a Black man will be put to death in the State of Mississippi based on the decision of a jury that was plausibly selected based on race. That is a tragedy, and it is exactly the tragedy that *Batson* and *Flowers* were supposed to prevent. I respectfully dissent from the Court's denial of certiorari.